IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cr. No. 19-1631 DHU |
| | ) | |
| **JOHNATHAN CRAFT**, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO DISMISS COUNTS 11 AND 12 BASED UPON IMPROPER SELECTIVE PROSECUTION**

THE UNITED STATES OF AMERICA responds to Defendant Johnathan Craft's *Motion to Dismiss Counts 11 and 12 Based Upon Improper Selective Prosecution* (Doc. 559) as follows.

On May 9, 2023, the federal grand jury returned a superseding indictment that added two charges with respect to Defendant Craft, those being (1) possession with intent to distribute heroin, in violation of 18 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count 11) and (2) possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 12). In response, Defendant Craft filed his Motion to Dismiss in which he claims that the United States selectively prosecuted him because he asserted a constitutionally protected right. (Doc. 559). The United States did no such thing. The United States' motivation for seeking the superseding indictment was separate and apart from any assertion of a constitutionally protected right. As such, the Court should reject the claim and permit the United States to proceed to trial on the charges for which a duly-appointed grand jury found probable cause.

**I.      FACTS**

      a.    **The Investigation**

As the Court is undoubtedly aware, the United States alleges that beginning no later than September 2017 the owners, managers, and employees of the Best Choice Inn, located at 7640 Central Avenue Southeast, Albuquerque, New Mexico, ran a sex and drug trafficking enterprise on the premises. The genesis of the case may be traced to repeated law enforcement contacts with the Best Choice Inn in the years leading up to the instant charges—it was, to be charitable, a haven for criminal activity. Based on that, the Drug Enforcement Administration initiated a narcotics investigation that focused on the activities on the premises. During the course of that drug investigation, something more sinister emerged: sex trafficking.

What the investigation revealed was that a cadre of prostitutes used the Best Choice Inn as their base of operations. Knowing that, the owners and management ran a shakedown operation that guaranteed them a piece of the prostitution profits. Their scheme was unsophisticated: the Defendants charged the prostitutes something they called a "visitor fee," which effectively tacked on an extra $10 to their rent each time they brought a customer into the room.[1] This $10 fee went straight into the pocket of the Inn's owner and/or lessee, which was subsequently deposited in bank accounts as if it were proceeds from the hotel. The shakedown aspect of the scheme involved what the Defendants did when the prostitutes failed to timely pay the "visitor fee." When that happened – and it often did – the Defendants would lock the prostitutes out of their rooms.

---

[1] The United States expects testimony that the "visitor fee" was purportedly applicable for all visitors staying over ten or fifteen minutes, however it was most frequently applied to the sex-workers living in the hotel due to the nature of their work. The United States also anticipates testimony that the "visitor fee" was not typically applied to guests who were not involved in criminal activity.

Having their doors locked was of no small consequence for the women. For most of them, their stay at the Best Choice Inn was not a short-term arrangement. They effectively lived at the Inn, so consequently all of their worldly possessions were inside the room. Perhaps of more consequence for the women was the fact that their narcotics were also inside the room. Virtually every prostitute working out of the Best Choice Inn was an addict, so losing access to their drugs, possessions, and to a "safe" space to conduct business caused significant distress.

Of course, the Defendants knew all of this, so they were confident that locking the prostitutes out of their rooms would provide proper incentive for them to pay their accumulated visitor fees. The Defendants also knew what the women would have to do to earn the money to pay them: walk the track. This simply means that the women would have to physically locate themselves on Central Ave. and the surrounding areas to attract clients with whom they would engage in commercial sex. The Defendants well knew that "walking the track" presented special dangers to the women, all of whom would prefer to work in the safer environs of the Best Choice Inn.

Through the coercive mechanisms of denying the women access to their possessions, separating them from their drugs, and forcing them to incur the dangers of walking the track, the Defendants insured that their $10 fees would continue to accumulate. But, they did not limit themselves to these sticks; they sometimes too would use carrots. For instance, Defendant Craft oftentimes supplied the women with narcotics, sometimes free of charge. For a street prostitute in Albuquerque hopelessly addicted to drugs, this was no small incentive to stay exactly where they were. And, that was the point. The Defendants wanted the prostitutes to stay and continue to pay, so the carrot and stick approach served their interests well.

b. **The Charging Decisions**

As with every case, the threshold question for the Department of Justice centered on the federal interests at stake. Here, that was an easy call. Human trafficking is a priority program for the Department, and the original indictment reflected that reality by focusing on those crimes committed specifically by the management team at the Inn. (See Doc. 2; filed on June 12, 2019).[2] While other charges were available, including possession with intent to distribute and associated 924(c) charges, the United States chose, as it often does, to focus the initial indictment to the core conduct at issue. Five months later, that indictment was superseded to add two Defendants, however the charges were not changed. (Doc. 68; filed on Nov. 7. 2019).

Afterward, the case settled into the familiar litigation/negotiation phase that saw some Defendants enter pleas and others opting to proceed to trial. With regard to the Defendants on the trial track, the United States Attorney's Office did what prosecutors have done since time immemorial: it reviewed the indictment to consider whether it could benefit from honing and refining. With respect to this case, that process began in earnest before the January 2023 trial setting with internal discussions about the viability of a RICO conspiracy in violation of 18 U.S.C. § 1962. To pursue RICO charges, DOJ policy requires approval from the Organized Crime and Gang Section of the Criminal Division in Washington, D.C. See Justice Manual § 9-11.200 – 400 at https://www.justice.gov/jm/jm-9-110000-organized-crime-and-racketeering#9-

---

[2] The original indictment charged the Defendants with conspiracy, in violation of 18 U.S.C. § 1594(c); three counts of sex trafficking by means of force, threats, fraud, and coercion, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(1), and 2; benefitting financially from a sex trafficking venture, in violation of 18 U.S.C. §§ 1591(a)(2), (b)(1), and 2; interstate and foreign travel and transportation in aid of racketeering enterprises, in violation of 18 U.S.C. §§ 1952(a)(3)(A) and 2; conspiracy, in violation of 21 U.S.C. § 846; maintaining a drug-involved premises, in violation of 21 U.S.C. §§ 860(a) and 2; maintaining a drug-involved premises within 1,000 feet of a school zone, in violation of 21 U.S.C. §§ 860(a) and 2; and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

110.101.  In practice, the process is lengthy, thus the USAO did not engage the Criminal Division prior to the January 2023 setting for fear of creating grounds for a continuance.

That changed, however, when the trial was unexpectedly continued on January 12, 2023. Internal discussions were re-ignited about adding a RICO charge, so USAO management made contact with the Criminal Division in Washington, D.C. on February 15, 2023 to begin the approval process.  In the end, the USAO opted not to pursue the process to completion, this time for fear of continuing the April 24, 2023, trial setting.

When the April 24 trial was reset to July 17, the USAO again considered its options with respect to superseding the indictment.  To that end, two options were on the table: the RICO charge and a combination of possession with intent to distribute heroin and a related 924(c) charge with respect to Defendant Craft.  While the RICO approval was again being sought, the United States opted to expeditiously return to the grand jury to add the two charges on Defendant Craft.  (*See* Doc. 530; filed on May 9, 2023).

Several factors weighed in favor of this course of action.  First, during the pre-trial evidentiary hearings held on March 21 and March 29, 2023, counsel for Defendant Craft affirmatively represented to the Court that he would not be disputing at trial the fact that Room 112 at the Best Choice was the room he occupied.  This was no small concession given that the heroin and gun supporting Counts 11 and 12 were in this room.  Thus, the concession assuaged evidentiary concerns the United States had with respect to the possession element.

Next, the United States determined that delay concerns inherent in a RICO charge were far less potent with the comparatively less complex possession with intent to distribute and 924(c) charges.  Indeed, years ago the physical evidence related to these charges had been disclosed to the Defendant, and the attorney for Defendant Craft traveled to the Drug

Enforcement Administration on December 6, 2022, to inspect the evidence in person. Thus, any sincere claim of "unfair surprise" was off the table.

Finally, regardless of whether the United States superseded the indictment, the drug and gun evidence supporting Counts 11 and 12 would still be admitted at trial because they support elements of other charged offenses. *See* Doc. 478 at 181-188; 191-194; 198-201; and 203-220). The United States therefore chose the lesser charges to avoid adding complexity to the case that might generate a continuance.

To be sure, the factual basis of these charges was already contained in the evidence previously produced in discovery. To help the jury make sense of facts foreign to most law-abiding citizens, the United States also notified the Defendant of its intent to introduce expert testimony regarding guns and drugs. To that end, on May 10, 2023, the United States promptly amended its expert disclosure in connection with DEA Agent Josh Belida to include the following:

1. *The manner in which drugs are packaged for sale, including the use of cutting agents, and how the possession of cutting agents indicates an intent to distribute because it creates more substance to be sold; and*
2. *Special Agent Belida will testify that drug traffickers frequently use, carry, and possess firearms during and in relation to and in furtherance of drug trafficking crimes. The possession of firearms is necessary to protect their merchandise and money from law enforcement and other drug traffickers, and other individuals who rob drug dealers of their product and currency.*

(Doc. 533 at p.2)

The facts – the physical evidence – is neither new nor in genuine dispute. Further, the testimony of a qualified law enforcement agent is routinely admitted under Fed. R. Evid. 702 to help jurors unfamiliar with the trade to understand the evidence. In fact, Judge Herrera recently permitted the same agent to offer substantially the same opinion in a trial that commenced on March 27, 2023. See *United States v. Eloy Romero*; CR-21-0559 JCH. Knowing that the United States

would not have to call any additional witnesses at trial to prove Counts 11 and 12, further knowing that ample time existed to litigate a relatively simple *Daubert* issue related to this "new" opinion, recognizing that the Craft/Patel counsels have combined litigation experience of over 100 years, and finally knowing that each of those counsels has encountered this form of narcotics expert opinion many times, the United States was not surprised when counsel for Defendant Craft represented to the Court during a May 17, 2023, status conference that counsel for all Defendants had conferred and agreed that a continuance was not necessary. Under these facts, why would it be? Soon thereafter, however, the Defendants collectively executed a 180-degree pirouette and argued that the new charges required such extensive litigation that they could not possibly be tried on July 17.

It is against this backdrop that the Defendant asserts a claim of selective prosecution.

**II.     THE LAW**

A selective enforcement claim is an equal protection challenge, which requires Defendant to prove that the conduct at issue "had a discriminatory effect and that it was motivated by a discriminatory purpose." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). As the Defendant correctly points out, to prevail on this claim he must show that "he has been singled out for prosecution while others similarly situated have not been proceeded against for the type of conduct forming the basis of the charge against him." *United States v. Salazar*, 720 F.2d 1482, 148 (10th Cir. 1983). Moreover, the Defendant must demonstrate that the prosecution was "invidious or in bad faith and was based on impermissible considerations such as . . . the desire to <u>prevent</u> the exercise of constitutional rights." *United States v. Furman*, 31 F.3d 1034, 1037 (10th Cir. 1994) (emphasis added).

"The standard for proving a selective-enforcement claim should be, as with selective-

prosecution claims, 'a demanding one.'" *See United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) (quoting *Armstrong*, 517 U.S. at 463); *United States v. Hernandez-Chaparro*, 357 F. App'x 165, 166 (10th Cir. 2009) ("Those seeking to establish an equal protection claim based on selective law enforcement face a high burden: they must dispel the presumption that a law enforcement official has not violated the Equal Protection Clause with 'clear evidence to the contrary.'") (quoting *Armstrong*, 517 U.S. at 463).

The bar is purposely set high for a Defendant asserting a selective enforcement claim because he is "requesting the judiciary to exercise power over a 'special province' of the executive branch, which could "chill law enforcement by subjecting the prosecutor's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Alcaraz-Arellano*, 441 F.3d at 1264.  For these reasons, courts are reluctant to interfere with the prosecutorial discretion of the executive branch. *See id.*

### III.   ARGUMENT

The takeaway from *Armstrong*, *Salazar*, *Alcaraz-Arellano*, and *Furman* is that the Defendant must establish two prongs to prevail.  First, he must show that the prosecution was invidious or in bad faith and was based on impermissible considerations such as the desire to prevent the exercise of constitutional rights.  Second, he must also show that he has been singled out for prosecution while others similarly situated have been let off the hook.  The Defendant has not established either of these requisite facts, therefore the Court must deny the motion.

   a. **The superseding indictment was not invidious or in bad faith or based on impermissible considerations.**

Stripped of its bark, the Defendant's motion imputes retaliatory motives to the Government's decision to seek a superseding indictment.  Craft's apparent theory is that his April

24, 2023, jury challenge was such an affront to the United States Attorney's Office that it sought punishment in the form of a superseding indictment. Indeed, if this were true then his motion perhaps would have legs. But, the facts on the ground are far less dramatic and much more grounded in the realities of criminal prosecution.

Quite simply, superseding indictments are not rare. The Government routinely seeks such indictments for a variety of sound and good reasons, including adding charges in anticipation of trial. See *United States v. Goodwin*, 457 U.S. 368, 380 (1982) ("An initial indictment – from which the prosecutor embarks on a course of plea negotiation – does not necessarily define the extent of the legitimate interests in prosecution. For just as a prosecutor may forgo legitimate charges already brought in an effort to save the time and expense of trial, a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded."). The sole and exclusive evidence that the Defendant relies upon to support his claim that this indictment is malignant is timing: *the superseding indictment came after his jury challenge, so it must have been sought in bad faith*. But the inference of bad faith based on timing is belied by the facts.

Here, the United States began the internal vetting of superseding the indictment many months before the April 24, 2023, trial setting that culminated in the jury challenge. That vetting included internal discussions by personnel up and down the chain of command. The vetting process included more than just talk—the United States Attorney's Office, consistent with Department of Justice policy, initiated contact with components in Washington, D.C. to begin the process of gaining approval of a RICO charge. The fact that the United States acted deliberately and coolly with regard to adding charges demonstrates that the superseding indictment was not the impulsive and spiteful act claimed by the Defendant.

Of course, the superseding indictment did not include the anticipated RICO charge, primarily because of the United States' concern of creating grounds for another continuance. To be sure, the United States recognizes that prolonged delays in cases involving transient witnesses could adversely impact their availability for trial testimony. Consequently, it did the next best thing by adding charges far less likely to result in continuance. Indeed, Defendant Craft *knew* that the United States recovered drugs and a gun from his room, he *knew* that the Government would be introducing that evidence at trial notwithstanding the superseding indictment, and his counsel laid eyes on that precise evidence as far back as December 2022. In terms of the presentation of evidence, nothing in the superseding indictment came as a surprise to the Defendant. Thus, adding the possession with intent to distribute and accompanying § 924(c) counts presented a less disruptive alternative to the Government than would a RICO charge.

Separate and apart from demonstrating bad faith – of which there was none – the Defendant must also demonstrate that the superseding indictment was sought for an impermissible purpose. The lion's share of selective enforcement motions assert racial bias as the impermissible motive, however here the Defendant opted for the motive expressly noted in *Salazar*: the superseding indictment was sought to prevent him from asserting a Constitutionally protected right. Specifically, the Defendant ties the superseding indictment to the jury challenge to support his claim.

This argument, however, explodes on takeoff because the superseding indictment did no such thing. The Defendant's jury challenge remains on the table even after the superseding indictment—not a single one of his Constitutional rights have been affected by the Government's return trip to the grand jury. Nor does the Defendant offer any theory as to how, in his view, the Government concluded that seeking a superseding indictment would somehow torpedo his jury

challenge.  The Government can think of no theory either; this case is set to proceed to trial however the Court decides to populate the jury venire.  The Government simply sought the superseding indictment to sharpen its case at trial after months of internal scrutiny and for reasons wholly unrelated to the jury challenge.

> b. **<u>The Defendant was not singled out while others similarly situated were not charged.</u>**

In addition to the foregoing, the Defendant must also demonstrate that he was singled out while others similarly situated were not charged.  In the context of selective enforcement claims, individuals are similarly situated when there are no legitimate distinguishing factors that could justify a difference in the enforcement decisions. *United States v. DeChristopher*, 695 F.3d 1082, 1097 (10th Cir. 2012).

The Defendant identifies four people he asserts are similarly situated: Willie Horton, Larry Woolridge, Ashley Langston, and Jane Doe 2.  A side-by-side comparison of each of those individuals to the Defendant, however, reveals that legitimate distinguishing factors justify a difference in enforcement decisions.

<u>Willie Horton</u>

Starting first with Willie Horton, he was a one-time Defendant who has since accepted responsibility and entered a plea of guilty to sex-trafficking charges.  Once upon a time, Horton and the Defendant were similarly situated because, out of the gate, they were charged with the identical ten crimes.  (*See* Doc. 68).  Over time, however, their similarities evaporated because Horton resolved his case by way of a plea, which included the standard provision that the United States would not bring additional charges that arose from the indictment.  Thus, by the time the United States superseded the indictment in May 2023, it could not have charged Mr. Horton with

any additional crimes.

More to the point, the Government chose not to charge Mr. Horton with possession with intent to distribute and an associated 924(c) count for the same reason the Defendant was not initially charged: prosecutorial discretion. The Supreme Court aptly summarized the extent of this executive function as follows:

> In our criminal justice system, the Government retains "broad discretion" as to whom to prosecute. *United States* v. *Goodwin*, 457 U.S. 368, 380, n. 11 (1982); accord, *Marshall* v. *Jerrico, Inc.*, 446 U.S. 238, 248 (1980). "[So] long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher* v. *Hayes*, 434 U.S. 357, 364 (1978). This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy. All these are substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute.

*Wayte v. United States*, 470 U.S. 598, 607-08 (1985)

The decision to initially forego possession with intent to distribute and 924(c) charges against Mr. Horton was premised on precisely the same prosecutorial discretion considerations outlined in *Wayte*. If Mr. Horton opted to exercise his right to a trial, then the United States Attorney's Office would have undertaken the same type of review of his slate of charges as it did with Craft. But, things unfolded differently, and in the course of that evolution Mr. Horton created legitimate distinguishing factors that justified a difference in the prosecutorial decisions. Thus, by

the time the United States superseded the indictment in May 2023, Craft and Mr. Horton were no longer similarly situated.

<u>Larry Woolridge</u>

Larry Woolridge was an extended-stay tenant at the Best Choice Inn and a small-time drug dealer who used the Inn as his base of operations. There may be some testimony that Woolridge was involved in putting out the hotel's "continental breakfast" each morning, however the United States has not found evidence Woolridge was actually employed with the hotel. The United States has no evidence Woolridge assessed or collected visitor fees on behalf of hotel management, or that he participated in locking the women out of their rooms. Furthermore, while there was a pistol found in Woolridge's room, as well as evidence of drug use, the six grams of suspected controlled substance found did not test positive at the DEA lab for a controlled substance. Given these facts, the United States cannot ethically charge Woolridge with possession with intent to distribute and 924(c) based on what was found in his room on June 18, 2019. This alone establishes legitimate distinguishing factors between Craft and Mr. Woolridge.

Moreover, as the Supreme Court recognized in *Wayte*, the Government's enforcement policies are one critical factor in determining how it wields its discretion. Here, the enforcement policy centered on those running the hotel as a drug premises and orchestrating a sex-trafficking scheme, so the indictment focused on those players. Unlike Craft, Mr. Woolridge was not one of the individuals intimately involved in sex trafficking, he had no management position with the hotel, and he did not possess narcotics in his room when it was searched. Therefore, legitimate distinguishing factors justify the difference in the enforcement decisions. Consequently, Craft and Woolridge are not similarly situated.

Ashley Langston

Ashley Langston was an employee of the Best Choice Inn, and, like Woolridge, she did engage in low-level narcotics sales at the hotel.  Upon review of the evidence, however, there is not a strong case that she was intimately involved in the sex-trafficking operation.  The United States has information that Ms. Langston did pitch to Kamal Bhula the idea of excluding the sex workers entirely from the hotel rather than constantly kicking them out and allowing them to come back.  Her proposal to Bhula, however, does not support a charge of sex trafficking—to the contrary, it is a *defense* to it.  Moreover, the Jane Does do not characterize Ms. Langston as someone who was helpful to them in any way, and her relationship with the sex workers at the hotel appears to be one where they avoided each other.  Is it possible that Ms. Langston did in fact engage in sex trafficking?  Perhaps.  But, the United States does not indict on matters that possibly happened, it indicts on matters it can prove beyond a reasonable doubt.

Finally, Ms. Langston did not possess a weight of narcotics comparable to that possessed by Craft.[3]  While there was evidence of drug use, there were no controlled substances seized from Ms. Langston's room on June 18, 2019.  If she did possess a user amount of narcotics in a pipe, such evidence is not consistent with intent to distribute. Furthermore, Ms. Langston did not possess a firearm as defined by federal law. Instead, she possessed a bb-gun or airsoft pistol. Therefore, the United States could not have levied similar charges to Craft because the evidence simply is not there. Therefore, Ms. Langston is not similarly situated to Craft.

Jane Doe 2

Finally, and perhaps most stunningly, the Defendant claims that one of his victims named

---

[3] Defendant Craft, in his motion, states that he had five grams of heroin. The actual amount of heroin in his room was approximately 25 grams, which is indicative itself of an intent to distribute.

in the indictment, Jane Doe 2, is similarly-situated to him because she possessed heroin and methamphetamine. Quite obviously, Jane Doe 2, like all crime victims, stands in direct contrast to the individual who inflicted harm upon her. She was not a sex trafficker. She was not in the management structure of the Best Choice Inn. She did not participate in a sex-trafficking conspiracy. She did not benefit financially from the operation. Instead, she was exploited by the Defendant and his co-conspirators for their own gain.

While there was evidence of drug use (i.e., at least one scale) in plain view in her room, as seen during the execution of the writ of entry, law enforcement did not search her room because it had no lawful authority to do so. Consequently, nothing was seized that could be used as evidence against her. Therefore, the United States is not in possession of any amount of narcotics pertaining to Jane Doe 2 from June 18, 2019.[4] Thus, it is axiomatic that legitimate distinguishing factors justify a difference in the enforcement decisions.

## IV.   CONCLUSION

Craft's entire argument rests on the false premise that the superseding indictment was sought in response to his jury challenge. In so doing, the Defendant conflates correlation with causation. Simply because one event follows another does not establish that one *caused* the other. Here, the superseding indictment had been discussed and contemplated for months before April 24, 2023, and the jury challenge was not a factor in the United States' decision to return to the grand jury. Moreover, the Defendant was not singled out for prosecution while others similarly-situated were not charged. Thus, for the foregoing reasons, the United States respectfully requests

---

[4] State Police encountered Jane Doe 2 approximately one month prior to the take down and did find suspected heroin on her person. The United States does not have sufficient evidence to believe this amount was consistent with distribution, or that Jane Doe 2 was engaged in the trafficking of narcotics. These narcotics are believed to still be in possession of State Police, and the United States does not know whether it has been tested in a lab.

that this Court deny the Defendant's Motion to Dismiss Counts 11 and 12.

                          Respectfully submitted,

                          ALEXANDER M.M. UBALLEZ
                          United States Attorney

                          ***Electronically filed June 27, 2023***
                          LETITIA CARROLL SIMMS
                          JACK E. BURKHEAD
                          Assistant United States Attorney
                          Post Office Box 607
                          Albuquerque, New Mexico 87103
                          (505) 346-7274