IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cr. No. 19-1631 DHU |
| | ) | |
| **JOHNATHAN CRAFT**, **et al.**, | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO
DISMISS COUNTS 11 AND 12 BASED UPON VINDICTIVE PROSECUTION**

THE UNITED STATES OF AMERICA responds to Defendant Johnathan Craft's *Motion
to Dismiss Counts 11 and 12 Based Upon Vindictive Prosecution* (Doc. 565) as follows.

On May 9, 2023, the federal grand jury returned a superseding indictment that added two
charges with respect to Defendant Craft, those being (1) possession with intent to distribute heroin,
in violation of 18 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count 11) and (2) possessing a firearm in
furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 12).  In
response, Defendant Craft filed his Motion to Dismiss in which he claims that the United States
vindictively prosecuted him because he asserted a constitutionally protected right. (Doc. 559).  The
United States did no such thing.  The United States' motivation for seeking the superseding
indictment was separate and apart from any assertion of a constitutionally protected right.  As such,
the Court should reject the claim and permit the United States to proceed to trial on the charges for
which a duly-appointed grand jury found probable cause.

## I.   FACTS

In the United States' Response to the Defendant's *Motion to Dismiss Counts 11 and 12
Based Upon Improper Selective Prosecution* (Doc. 569), the Government exhaustively set forth

the pertinent facts which are necessary for the proper resolution of the instant motion.  The United States incorporates those facts herein by reference.

## II.     THE LAW

To establish a claim for vindictive prosecution, the Defendant must prove "either (1) actual vindictiveness, or (2) a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness."  *United States v. Portillos*, 714 Fed. Appx. 889, 892-893 (10th Cir. 2017), (quoting *United States v. Raymer*, 941 F.2d 1031, 1040 (10th Cir. 1991)).  Actual vindictiveness occurs when the government's decision to prosecute "was 'a direct and unjustifiable penalty for the exercise of a procedural right' by the defendant*." United States v. Ray*, 899 F.3d 852, 860 (10th Cir. 2018) (quoting *Raymer*, 941 F.2d at 1041 and *United States v. Goodwin*, 457 U.S. 368, 384 n.19 (1982)).  Demonstration of actual vindictiveness requires "objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights." *United States v. LaDeau*, 734 F.3d 561, 566 (6th Cir. 2013); see also *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001) (holding that actual vindictiveness must demonstrate: "(1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus.").  "Attempting to show actual vindictiveness has been characterized as exceedingly difficult and an onerous burden." *United States v. Dupree*, 323 F.3d 480, 489 (6th Cir. 2003) (internal quotations omitted); see also *United States v. Gary*, 291 F.3d 30, 34, (D.C. Cir. 2002); *United States v. Jarrett*, 447 F.3d 520, 527 (7th Cir. 2006) (finding no actual vindictiveness where defendant provided no "smoking gun" statement of outright prosecutor animus and instead relied on speculated motives and suspicious timing).

To establish presumptive vindictiveness, on the other hand, Craft must show that "as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would

not have occurred but for hostility or punitive animus towards the defendant because he exercised his specific legal right." *United States v. Wall*, 37 F.3d 1443,1448 (10th Cir. 1994).  As the Tenth Circuit has observed, "[c]ritically, courts tend to find presumptive vindictiveness only in post-trial situations, such as when a defendant successfully attacks his first conviction and then receives a harsher sentence on retrial, or when the prosecutor clearly has a considerable stake in discouraging convicted misdemeanants from appealing by charging a successful appellant with a felony covering the same facts." *Ray*, 899 F.3d at 860 (internal quotations omitted); see also *United States v. Lampley*, 127 F.3d 1231, 1245 (10th Cir. 1997) (the Supreme Court has generally rejected the presumption of prosecutorial vindictiveness in the pretrial context.).  Indeed, "neither the Supreme Court nor the Tenth Circuit has ever found presumptive vindictiveness in a pretrial setting.  *Ray*, 899 F.3d at 860 (citing *United States v. Creighton*, 853 F.3d 1160, 1164 (10th Cir. 2017)).  Finally, vindictiveness may not be presumed from the mere appearance of vindictive motives.  *United States v. Sarracino*, 340 F.3d 1148, 1177-78 (10th Cir. 2003).

*Ray* illustrates the limitations of presumptively vindictive prosecution claims in a pre-trial setting.  In that case, Ray, like Craft, claimed prosecutorial vindictiveness in a pre-trial setting after the Government added two charges prior to trial.  Echoing many Craft's contentions, Ray supported his claim of actual and presumptive vindictiveness by arguing that the Government: (1) could have included the two new counts in the original indictment but failed to do so; (2) declined to add those same counts against a co-defendant who had agreed to enter a guilty plea; and (3) charged those counts only after he filed several pre-trial motions and rejected a plea offer.

After quickly determining that these facts do not establish actual vindictiveness, the Tenth Circuit examined whether they gave rise to presumptive vindictiveness.  In holding that they do not, the Court held that "[f]irst, . . . Ray's allegations arise from a pretrial situation, where we've

never before found presumptive vindictiveness." *Ray* at 860-61 (citing *Creighton*, 853 F.3d at 1164).  The Court continued by observing that "[a]dding new counts to an indictment typically falls well within the bounds of prosecutorial discretion, at least where there exists probable cause to support those counts." *Id*. (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion.")).

The Court then addressed Ray's argument that timing can support a claim of presumptive vindictiveness by holding that the general rule that adding charges to an indictment falls within the bounds of prosecutorial discretion equally applies after "a prosecutor adds counts after a defendant rejects a plea offer." *Ray,* 899 F.3d at 861.  In reaching that conclusion, the Tenth Circuit relied upon *Goodwin*, which held that "[a]n initial indictment—from which the prosecutor embarks on a course of plea negotiation—does not necessarily define the extent of the legitimate interest in prosecution." *Goodwin*, 457 U.S. at 380.  Piggybacking on the *Goodwin* holding, the Tenth Circuit found that "it also applies where, as here, the prosecutor (1) adds counts against a defendant who rejects a plea offer but (2) does not add counts against a codefendant who accepts one." *Ray*, 899 F.3d at 861.  Thus, the Tenth Circuit declined to presume that the prosecutor vindictively added the new counts to retaliate against Ray for filing pre-trial motions and refusing to enter a plea.  *Id*. (citing *Goodwin* at 381 (cautioning that it's "unrealistic to assume that a prosecutor's . . . response to such motions is to seek to penalize and to deter")).

The analysis does not end if the Defendant establishes actual or presumptive vindictiveness.  "Thereafter, the burden shifts to the prosecution to justify its decision with legitimate, articulable, objective reasons" to explain its actions. *Raymer*, 941 F.2d at 1040.  "In

determining whether the government has engaged in prosecutorial vindictiveness, this court must determine whether the prosecution engaged in conduct that would not have occurred but for the prosecution's desire to punish the defendant for exercising a specific legal right." *Id*. (quoting *United States v. Sarracino*, 340 F.3d at 1148, 1178 (10th Cir. 2003)).

### III.    ARGUMENT

Craft's motion focuses almost entirely on the theory of presumptive vindictiveness. While citing to general legal principles in connection with actual vindictiveness, he does not set forth any facts nor make any argument supporting that theory. Nowhere in his motion does Craft point to any "objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights," see *LaDeau*, 734 F.3d at 566, or a "smoking gun" statement of outright prosecutor animus that establishes actual vindictiveness. See *Dupree*, 323 F.3d at 489. As such, this Court should quickly find that no actual vindictiveness occurred here.

Craft instead focuses his claim on presumptive vindictiveness. In making that argument, Craft fails to acknowledge that not once has the Tenth Circuit found presumptive prejudice in a pre-trial setting. While conspicuously silent on that point, Craft very loudly engages in speculation to support his claim. For example, he asks the Court to read malevolence in the timing of the superseding indictment; he takes issue with what he characterizes as "indignant" prosecutors; and he imagines that "similarly situated" individuals were not charged in the superseding indictment. None of that supports a claim of actual vindictiveness.

### a.  The timing of the superseding indictment

Craft writes "only after Mr. Craft exercised his constitutional rights . . . did the government convene a new grand jury to add two new and different offenses to the list of charges against Mr. Craft." Doc. 565 at p.9. Stated differently, Craft asks this Court to presume vindictiveness based

on timing.  But, *Ray* teaches that this Court cannot jump to that conclusion. Indeed, "[t]iming alone

is not enough to give rise to a presumption of prosecutorial vindictiveness *in the pretrial setting*.

*Creighton*, 853 F.3d 1164.   Long ago, the Tenth Circuit recognized that "a presumption of

vindictiveness based on timing alone [was] unsound as it could easily be abused."  *United States*

*v. Miller*, 948 F.2d 631, 634 (10th Cir. 1991).  In *Miller*, the Tenth Circuit observed that "adopting

such a presumption would give sophisticated criminal suspects an opportunity to file civil charges

against the government prior to an impending indictment, thus creating the presumption that the

eventual charges were brought vindictively."  *Id*.

Moreover, Craft's timing argument flies headlong into the bedrock principle that

correlation does not imply causation.  Here, Craft fails to recognize that by reflexively concluding

that a preceding event (the jury challenge) must have *caused* a subsequent one (the superseding

indictment).  Indeed, his entire motion rests on his embrace of that logical fallacy.  So wed to that

fallacy is Craft that he has not once acknowledged that other factors could account for the

superseding indictment.

As was discussed in *the United States' Response to Defendant's Motion to Dismiss*

*Counts 11 and 12 Based Upon Improper Selective Prosecution* (Doc. 569), others factors do

account for the United States' decision to seek a superseding indictment.  Indeed, the United

States began the internal discussions about a superseding many months before Craft lodged his

jury challenge.  That process began in earnest before the January 2023 trial setting when the

United States began contemplating adding RICO charges, in violation of 18 U.S.C. § 1962, to the

then-existing indictment.  To pursue RICO charges, DOJ policy requires approval from the

Organized Crime and Gang Section of the Criminal Division in Washington, D.C.  See Justice

Manual § 9-11.200 – 400 at https://www.justice.gov/jm/jm-9-110000-organized-crime-and-

racketeering#9-110.101.  In practice, the process is lengthy, thus the USAO did not engage the

Criminal Division prior to the January 2023 setting for fear of creating grounds for a

continuance.

That changed, however, when the trial was unexpectedly continued on January 12, 2023.

Internal discussions were re-ignited about adding a RICO charge, so USAO management made

contact with the Criminal Division in Washington, D.C. on February 15, 2023, to begin the

approval process.  In the end, the USAO opted not to pursue the process to completion, this time

for fear of continuing the April 24, 2023, trial setting.

When the April 24 trial was reset to July 17, the USAO again considered its options with

respect to superseding the indictment.  To that end, two options were on the table: the RICO

charge and a combination of possession with intent to distribute heroin and a related 924(c)

charge with respect to Defendant Craft.  While the RICO approval was again being sought, the

United States opted to expeditiously return to the grand jury to add the two charges on Defendant

Craft.  (*See* Doc. 530; filed on May 9, 2023).

Several factors weighed in favor of this course of action.  First, during the pre-trial

evidentiary hearings held on March 21 and March 29, 2023, counsel for Defendant Craft

affirmatively represented to the Court that he would not be disputing at trial the fact that Room

112 at the Best Choice was the room he occupied.  This was no small concession given that the

heroin and gun supporting Counts 11 and 12 were in this room.  Thus, the concession assuaged

evidentiary concerns the United States had with respect to the possession element.

Next, the United States determined that the delay concerns inherent in a RICO charge

were far less potent with the comparatively less complex possession with intent to distribute and

924(c) charges.  Indeed, years ago the physical evidence related to these charges had been

disclosed to the Defendant, and the attorney for Defendant Craft traveled to the Drug

Enforcement Administration on December 6, 2022, to inspect the evidence in person.  Thus, any

sincere claim of "unfair surprise" was off the table.

Finally, regardless of whether the United States superseded the indictment, the drug and

gun evidence supporting Counts 11 and 12 would still be admitted at trial because they support

elements of other charged offenses.  *See* Doc. 478 at 181-188; 191-194; 198-201; and 203-220).

The United States therefore chose the lesser charges to avoid adding complexity to the case that

might generate a continuance.

That sequence of events belies Craft's theory that the jury challenge *caused* the

superseding indictment.  It simply did not.  The machinery had been activated long beforehand,

and the fact that the superseding indictment came after the jury challenge was mere

happenstance.

**b.  The nature of the advocacy**

Craft reasons that the United States vindictively sought a superseding indictment because

the "Government was very upset by Mr. Craft's [jury] motion."  Doc. 565 at p.10.  To support this

"very upset" theory, Craft points to the Government's response to his motion for a special jury list

(Doc. 523) in which he takes issue with the following: (1) the term "gamesmanship"; (2)

unspecified "complaints" about Craft's filing a motion for a special jury list; and (3) use of the

phrases "putting the cart before the horse" and "assertion of a non-existent right."  *Id*.  According

to Craft, "[t]hen, and only then, came additional charges against Mr. Craft."  Doc. 565 at p.10.

As discussed above, Craft is incorrect with respect to his "then and only then" theory.  The

United States had long since begun the vetting for a superseding indictment.  That notwithstanding,

the Government is puzzled as to how the relatively tame language it employed in its response to

his motion for a special jury list creates any inferences of vindictiveness.   Did the United States

oppose the motion?   Certainly. Did its response make that point?   It surely did.   Was it blunt?

Perhaps.   But, as the Court has witnessed, all parties in this case, including the United States, have

zealously represented their respective client's interests and, to that end, have sprinkled rhetorical

flourishes into their advocacy throughout this case.   That response was no different.

Even if the United States had hypothetically employed more vitriolic language in the

response, it still would not lend support to Craft's claim.   "Government attorneys are not foot

soldiers in the Queen's Guard, required to maintain a stoic composure in the face of extreme

circumstances."   *United States v. Rasco*, No. CR408-100, 2010 U.S. Dist. LEXIS 52767 (S.D.

Georgia, May 27, 2010).   Indeed, prosecutors are entitled to strike hard blows in their advocacy,

just not foul ones.   *Berger v. United States*, 295 U.S. 78, 88 (1935).   In the response Craft cites,

the United States may have arguably struck hard, but it did not hit foul.   And, Craft has offered no

authority to support his claim that the rhetoric employed by the United States in it rises to the level

of vindictiveness.

### c.   The United States did not treat similarly-situated individuals differently

To further support his claim of presumptive vindictiveness, Craft  makes the spurious claim

that similarly-situated individuals were not charged.   But, even a passing glance at the claimed

"similarly-situated" individuals gives lie to the Defendant's argument.   The Government will

discuss each in turn:

<u>Willie Horton</u>

Starting first with Willie Horton, he was a one-time Defendant who has since accepted

responsibility and entered a plea of guilty to sex-trafficking charges.   Once upon a time, Horton

and the Defendant were similarly situated because, out of the gate, they were charged with the

identical ten crimes.  (*See* Doc. 68).   Over time, however, their similarities evaporated because

Horton resolved his case by way of a plea, which included the standard provision that the United

States would not bring additional charges that arose from the indictment.  Thus, by the time the

United States superseded the indictment in May 2023, it could not have charged Mr. Horton with

any additional crimes.

More to the point, the Government chose not to charge Mr. Horton with possession with

intent to distribute and an associated 924(c) for the same reason the Defendant was not initially

charged: prosecutorial discretion.   The Supreme Court aptly summarized the extent of this

executive function as follows:

> In our criminal justice system, the Government retains "broad discretion" as
> to whom to prosecute. *United States* v. *Goodwin*, 457 U.S. 368, 380, n. 11
> (1982); accord, *Marshall* v. *Jerrico, Inc*., 446 U.S. 238, 248 (1980). "[So]
> long as the prosecutor has probable cause to believe that the accused
> committed an offense defined by statute, the decision whether or not to
> prosecute, and what charge to file or bring before a grand jury, generally rests
> entirely in his discretion." *Bordenkircher* v. *Hayes*, 434 U.S. 357, 364
> (1978). This broad discretion rests largely on the recognition that the decision
> to prosecute is particularly ill-suited to judicial review. Such factors as the
> strength of the case, the prosecution's general deterrence value, the
> Government's enforcement priorities, and the case's relationship to the
> Government's overall enforcement plan are not readily susceptible to the kind
> of analysis the courts are competent to undertake. Judicial supervision in this
> area, moreover, entails systemic costs of particular concern. Examining the
> basis of a prosecution delays the criminal proceeding, threatens to chill law
> enforcement by subjecting the prosecutor's motives and decision making to
> outside inquiry, and may undermine prosecutorial effectiveness by revealing
> the Government's enforcement policy. All these are substantial concerns that
> make the courts properly hesitant to examine the decision whether to
> prosecute.

*Wayte v. United States*, 470 U.S. 598, 607-08 (1985)

The decision to initially forego possession with intent to distribute and 924(c) charges

against Mr. Horton was premised on precisely the same prosecutorial discretion considerations

outlined in *Wayte*.  If Mr. Horton opted to exercise his right to a trial, then the United States

Attorney's Office would have undertaken the same type of review of his slate of charges as it did

with Craft.  But, things unfolded differently, and in the course of that evolution Mr. Horton created

legitimate distinguishing factors that justified a difference in the prosecutorial decisions. Thus, by

the time the United States superseded the indictment in May 2023, Craft and Mr. Horton were no

longer similarly situated.

Larry Woolridge

Larry Woolridge was an extended-stay tenant at the Best Choice Inn and a small-time drug

dealer who used the Inn as his base of operations.  There may be some testimony that Woolridge

was involved in putting out the hotel's "continental breakfast" each morning, however the United

States has not found evidence Woolridge was actually employed with the hotel. The United States

has no evidence Woolridge assessed or collected visitor fees on behalf of hotel management, or

that he participated in locking the women out of their rooms. Furthermore, while there was a pistol

found in Woolridge's room, as well as evidence of drug use, the six grams of suspected controlled

substance found did not test positive at the DEA lab for a controlled substance. Given these facts,

the United States cannot ethically charge Woolridge with possession with intent to distribute and

924(c) based on what was found in his room on June 18, 2019.  This alone establishes legitimate

distinguishing factors between Craft and Mr. Woolridge.

Moreover, as the Supreme Court recognized in *Wayte*, the Government's enforcement

policies are a critical factor in determining how it wields its discretion.  Here, the enforcement

policy centered on those running the hotel as a drug premises and orchestrating a sex-trafficking

scheme, so the indictment focused on those players.  Unlike Craft, Mr. Woolridge was not one of

the individuals intimately involved in sex trafficking, he had no management position with the

hotel, and he did not possess narcotics in his room when it was searched. Therefore, legitimate distinguishing factors justify the difference in the enforcement decisions. Consequently, Craft and Woolridge are not similarly situated.

Ashley Langston

Ashley Langston was an employee of the Best Choice Inn, and, like Woolridge, she did engage in low-level narcotics sales at the hotel. Upon review of the evidence, however, there is not a strong case that she was intimately involved in the sex-trafficking operation. The United States has information that Ms. Langston did pitch to Kamal Bhula the idea of excluding the sex workers entirely from the hotel rather than constantly kicking them out and allowing them to come back. Her proposal to Bhula, however, does not support a charge of sex trafficking—to the contrary, it is a *defense* to it. Moreover, the Jane Does also do not characterize Ms. Langston as someone who was helpful to them in any way, and her relationship with the sex workers at the hotel appears to be one where they avoided each other. Is it possible that Ms. Langston did in fact engage in sex trafficking? Perhaps. But, the United States does not indict on matters that possibly happened, it indicts on matters it can prove beyond a reasonable doubt.

Lastly, Ms. Langston did not possess a weight of narcotics comparable to that possessed by Craft.[1] While there was evidence of drug use, there were no controlled substances seized from Ms. Langston's room on June 18, 2019. If she did possess a user amount of narcotics in a pipe, such evidence is not consistent with intent to distribute. Furthermore, Ms. Langston did not possess a firearm as defined by federal law. Instead, she possessed a bb-gun or airsoft pistol. Therefore, the United States could not have levied similar charges to Craft because the evidence

---

[1] Defendant Craft, in his motion, states that he had five grams of heroin. The actual amount of heroin in his room was approximately 25 grams, which is indicative itself of an intent to distribute.

simply was not there. Therefore, Ms. Langston is not similarly situated to Craft.

<u>Jane Doe 2</u>

Finally, and perhaps most stunningly, the Defendant claims that one of his victims named in the indictment, Jane Doe 2, is similarly-situated to him because she possessed heroin and methamphetamine. Quite obviously, Jane Doe 2, like all crime victims, stands in direct contrast to the individual who inflicted harm upon her. She was not a sex trafficker. She was not in the management structure of the Best Choice Inn. She did not participate in a sex-trafficking conspiracy. She did not benefit financially from the operation. Instead, she was exploited by the Defendant and his co-conspirators for their own gain.

While there was evidence of drug use (i.e., at least one scale) in plain view in her room, as seen during the execution of the writ of entry, law enforcement did not search her room because it had no lawful authority to do so. Consequently, nothing was seized that could be used as evidence against her. Therefore, the United States is not in possession of any amount of narcotics pertaining to Jane Doe 2 from June 18, 2019.[2] Thus, it is axiomatic that legitimate distinguishing factors justify a difference in the enforcement decisions.

### d.  The cases cited by Craft are distinguishable

Craft relies on two cases, *United States v. Wood*, 36 F.3d 945 (10th Cir. 1994) and *United States v. Jenkins*, 804 F.3d 945 (9th Cir. 2007), to support his claim of vindictive prosecution. Both of these cases are readily distinguishable.

---

[2] State Police encountered Jane Doe 2 approximately one month prior to the take down and did find suspected heroin on her person. The United States does not have sufficient evidence to believe this amount was consistent with distribution, or that Jane Doe 2 was engaged in the trafficking of narcotics. These narcotics are believed to still be in possession of State Police, and the United States does not know whether it has been tested in a lab.

Looking first at *Wood*, that case presented a convoluted procedural history that started innocently enough with charges of obstructing justice and making false statements to the FBI. The district court dismissed the obstruction charge prior to the trial, and the jury subsequently convicted Wood of uttering the false statement. Afterward, the district court granted him a new trial on that charge, which made its way to the Tenth Circuit where that court affirmed the grant of a new trial and re-instated the previously-dismissed obstruction charge. On remand, the district court dismissed the entire indictment on other grounds, which prompted the United States to obtain a fresh indictment on a new slate of charges that arose from the same set of facts. That new indictment was the focus of the vindictive prosecution motion.

In affirming that district court's dismissal based on a presumptively vindictive prosecution, the Tenth Circuit observed that "[a] change in a charging decision made after an initial trial, as was the charging decision in this case, is much more likely to be improperly motivated than is a pre-trial decision. *Wood*, 36 F.3d at 946-47 (citing *Goodwin*, 457 U.S. at 381). "Not only was the decision to reindict Defendant on a new charge made after his initial trial was complete, it was made more than two years after his trial, it was not based on any new evidence or change in circumstances, and it was made soon after Defendant exercised a legal right to the government's disadvantage." *Id*.

None of the equities cited in *Wood* are present here. First, the United States did not add new charges against Craft after a trial; instead, this case is in the paradigmatic posture where neither the Supreme Court nor the Tenth Circuit has ever "found presumptive vindictiveness in a pretrial setting." *Ray*, 899 F.3d at 860. To the contrary, this case merely illustrates that "[i]t is well-settled that an initial charging decision does not freeze future conduct" by the

government,  *Sarracino*, 340 F.3d at 1177, and that "[a]dding new counts to an indictment typically falls well within the bounds of prosecutorial discretion." *Ray*, 899 F.3d at 861.

Next, unlike in *Wood*, here there was a genuine change in circumstances that weighed in favor of superseding the indictment.  During the pre-trial evidentiary hearings held on March 21 and March 29, 2023, counsel for Defendant Craft affirmatively represented to the Court that he would not be disputing at trial the fact that Room 112 at the Best Choice was the room he occupied. This concession assuaged evidentiary concerns the United States had with respect to the possession element.

Finally, unlike in *Wood*, Craft did not assert any right that disadvantaged the United States. In *Wood*, the United States suffered the ultimate disadvantage: an indictment was dismissed.  Here, all that happened was a challenge to the jury pool.  Certainly, the United States will litigate that motion because it believes it to be meritless, but it cannot be seriously argued that the Government is disadvantaged here in the same way as *Wood*.  The trial is still scheduled.  The United States is still ready to present its evidence to a duly constituted jury.  And, a verdict will be rendered.  Thus, whatever inference the Tenth Circuit drew in *Wood* regarding the motivation of the prosecutor is simply not present here.

Turning to *Jenkins*, that Ninth Circuit case involved a defendant who made three ill-fated trips from Mexico into the United States.  The first two occurred in October 2004 when she was transporting illegal aliens.  She was not charged in connection with those crossings.  The third trip occurred two months later in January 2005 when, this time, she was transporting marijuana.  She was charged with that offense and tried on April 6, 2005, just three months after her arrest.  During the trial, Jenkins testified in her own defense during which she made incriminating statements regarding smuggling aliens.  That admission prompted the United States to file a complaint

charging alien smuggling while the jury was deliberating on the importation charge.   The

subsequent indictment on the alien smuggling charge was the subject of a vindictive prosecution

claim in which Jenkins claimed that the alien smuggling charges were brought only after she

elected to testify in her defense at the marijuana importation trial.

 In granting that vindictive prosecution motion, the district court stated that its ruling was a

"prophylactic" measure intended to prevent the chilling of a defendant's ability to take the witness

stand. *Jenkins*, 504 F.3d at 699.   The Ninth Circuit affirmed.   In reaching that holding, the Ninth

Circuit relied upon the testimony of the AUSA who admitted that the Government possessed

sufficient evidence to charge Jenkins with alien smuggling prior to her in-court admissions and

that it "could have brought charges earlier on." *Id*.   In response to a United States' argument that

charges were filed while the jury was deliberating because bringing them after trial would have

appeared vindictive, the Ninth Circuit observed that "if the Government had been concerned with

appearing vindictive, it could have filed the alien smuggling charges in January," that is to say,

three months before trial. *Id*.

 It should not be lost on this Court what the Ninth Circuit was saying here.   By the plain

terms of their holding, the Ninth Circuit found that it would have been perfectly acceptable to

lodge the alien smuggling charges three months before trial.   Compare that to what is before this

Court: the Government superseded its indictment two and one-half months before trial, a

distinction with hardly a difference.   Here, the United States did exactly what the *Jenkins* court

said should have been done.   For this reason alone, *Jenkins* offers Craft no support.

 Separate and apart from that, *Jenkins* involved what was functionally a post-trial claim, a

posture where the Tenth Circuit has never before found presumptive vindictiveness. *Ray,* 899 F.3d

at 860-61.   Thus, the Ninth Circuit's holding in *Jenkins* simply lends no support Craft's argument.

The Court can begin and end its analysis right here.  Indeed, if the defendant fails to prove actual or presumptive vindictiveness, the trial court need not address the government's justification for its prosecutorial decision.  *Sarracino*, 340 F.3d at 1177 (The Defendant cannot demonstrate either actual or presumptive vindictiveness, therefore his claim must fail).

> **e.**  **The Government had legitimate, articulable, and objective reasons for superseding the indictment**

Assuming that Craft can establish either actual or presumptive vindictiveness, the burden then shifts to the Government to set forth legitimate, articulable, objective reasons for the superseding indictment.  *Raymer*, 941 F.2d at 1040.  "In determining whether the government has engaged in prosecutorial vindictiveness, this court must determine whether the prosecution engaged in conduct that would not have occurred but for the prosecution's desire to punish the defendant for exercising a specific legal right."  <u>Sarracino</u>, 340 F.3d at 1178.

The gist of the Defendant's claim boils down to this: but for my challenge to the jury pool, the Government would not have superseded.  He is wrong about that.  As discussed both above and in the *United States' Response to the Defendant's Motion to Dismiss Based Upon Improper Selective Prosecution* (Doc. 569), the genesis of the superseding indictment pre-dated the jury challenge.  It follows that if the machinery for the superseding indictment had been activated in late 2022 then an event that occurred in April 2023 necessarily could not be the "but for" cause of the superseding indictment.

More importantly, the fact that the United States undertook the process of vetting a superseding indictment prior to the jury challenge demonstrates that it had objective and legitimate reasons to add new charges.  It was objective because the vetting process occurs in virtually every case on the trial track.  It was legitimate because it was not prompted by any motion filed by Craft.

The superseding evidence is not evidence of vindictive prosecution, rather it is simply the latest example of how "[a]n initial indictment – from which the prosecutor embarks on a course of plea negotiation – does not necessarily define the extent of the legitimate interest in prosecution." *Goodwin*, 457 U.S. at 380. Quite simply, the jury challenge had no bearing on the United States' decision to seek a superseding indictment.

## IV.   CONCLUSION

Craft's motion does not support a claim for vindictive prosecution. He offers no facts establishing that actual vindictiveness occurred, and the pre-trial posture of the case puts it outside the bounds of presumptive vindictiveness. Moreover, the facts Craft relies upon to support presumptive vindictiveness – time, zealous advocacy, and alleged disparate treatment of similarly-situated individuals – do not withstand scrutiny. The timing of the superseding indictment is happenstance in that the Government had long before began review of the initial indictment to determine if new charges were warranted. The advocacy in this case, while zealous, does not evince any vindictiveness on the part of the Government. And, the alleged similarly-situated individuals are readily distinguishable from Craft. For those reasons, the United States respectfully requests that this Court deny the Defendant's Motion to Dismiss Counts 11 and 12 Based Upon Vindictive Prosecution.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

***Electronically filed June 27, 2023***
LETITIA CARROLL SIMMS
JACK E. BURKHEAD
Assistant United States Attorney
Post Office Box 607
Albuquerque, New Mexico 87103
(505) 346-7274