## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**vs.**                                                  **No. 19-1631-DHU**

**KAMAL BHULA, et al.**

        **Defendant.**

## DEFENDANT KAMAL BHULA'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

COMES NOW, Defendant Kamal Bhula, by and through counsel of record Nicole W. Moss and Sarah M. Gorman, and hereby respectfully submits the following objections to the Presentence Investigation Report (hereinafter "PSR"). [Doc. 590]

### I.    ALLEGED CONDUCT

Mr. Bhula objects to many allegations as described in the section labelled "The Offense Conduct" as well as the allegations described in the section labelled "Offense Behavior Not Part of Relevant Conduct". The allegations described in the PSR paint a sensationalist picture of a vast criminal enterprise that is not supported by the evidence, ignores facts to the contrary and was heavily dependent on unreliable sources with their own agendas. These misrepresentations, exaggerations and falsehoods permeate the investigation that was conducted and ultimately led to the charges that were filed against Mr. Bhula and his co-defendants. These allegations are the same "facts" that have repeatedly been challenged in previous hearings and proven to be unreliable or patently false. Unfortunately, they are now being repeated in the PSR with the effect of unfairly driving up the guideline range that is

1

being presented to the Court for consideration at sentencing.  Specifically, Mr. Bhula objects as follows:

**A.  Alleged "Offense Conduct"**

The PSR begins its recitation of the alleged offense conduct with a disclaimer that the information was obtained from various investigative reports contained within the U.S. Attorney's file, as well as information contained during communications with the assigned case agent.  *See* PSR at ¶ 11.  While that may be true, the trouble in this case lies in the fact that much of the information from those sources is inaccurate, completely false or at the least, misleading and taken out of context.  There appears to be no effort by the probation officer to verify the accuracy of the information within the reports, and in some troubling cases, the summaries provided are highly selective and exclude information that is exculpatory to Mr. Bhula.  As a result, Mr. Bhula submits the following objections to the allegations as provided in the "Offense Conduct" section of the PSR:

1. Paragraph 12- Mr. Bhula objects to the allegation that he was involved in a conspiracy to maintain a drug-involved premises beginning no later than September of 2017.  In September of 2017 Mr. Bhula was living in Grand Junction, Colorado with his wife, managing a hotel.  At that time he had never been to New Mexico, had never heard of the Best Choice Inn, and had never met Johnathan Craft, Eddie Hill or Willie Horton. His knowledge of Pragneshkumar Patel, a distant relative of his wife, was minimal.  Mr. Bhula was not aware that Mr. Patel and his mother had purchased the motel and had no plans to move to Albuquerque to assume management of a motel that he did not know existed. Simply put, no conspiracy involving Mr. Bhula existed in September of 2017.

Further, Mr. Bhula disputes that he was ever involved in a criminal conspiracy with anyone. Mr. Bhula concedes that he entered into a lease agreement with Mr. Patel in March of 2018 to lease the Best Choice Inn but the purposes of that were solely to conduct legitimate business on the property, i.e., to run a motel. Mr. Bhula never entered into an agreement with any of the co-defendants to engage in drug trafficking or human trafficking. Instead, the actions that were undertaken by Mr. Bhula were in an effort to profitably manage the motel and to clean it up for the guests.

2. Paragraph 13- Mr. Bhula objects to the insinuation that he allowed tenants and employees to use drugs at the Best Choice Inn without recourse. When Mr. Bhula became aware that specific tenants or employees were using drugs on-site, they would be evicted and/or terminated from employment. Unfortunately, he often did not know who was using drugs or where they were using drugs. Mr. Bhula was not inclined to evict tenants, many of whom had nowhere else to go, just because he suspected they were under the influence of a substance. Likewise, Mr. Bhula terminated employees when they came to work under the influence of any substances and when he became aware the they were selling drugs. For example, he terminated Defendant Horton in early 2019 because Mr. Horton was coming to work high on drugs and evicted him from the motel. Mr. Bhula was not aware that Mr. Horton was a drug dealer at the time. Eventually he allowed Mr. Horton to move back into the motel but never re-hired him. Likewise, Mr. Bhula also fired Defendant Hill and evicted him from the property after he caught Mr. Hill working while intoxicated with alcohol. Mr. Bhula was not aware of any illegal activities engaged in by Mr. Hill and eventually permitted him to move back into the motel in May of 2019.

3

3.  Paragraph 14- Mr. Bhula acknowledges that numerous phone calls were made to 911 regarding the area surrounding the Best Choice Inn.  The Best Choice Inn is located in an area of Albuquerque that historically has a high crime rate.  This high crime rate has persisted for years before Mr. Bhula ever even came to America and is ongoing today.  Mr. Bhula also acknowledges that he did have frequent contact with law enforcement when they responded to the motel.  Mr. Bhula actually called 911 on several occasions, seeking assistance from law enforcement.  This was one of the many things he did during his management of the motel in an effort to clean up the property.  As the manager of the motel, he was also the obvious contact person for police officers on-site.  Mr. Bhula objects to the selective recitation of facts as stated in paragraph 14 and any inference that the number of 911 calls or the fact that he would assist law enforcement when they arrived is evidence of criminal activity.

4.  Paragraph 15- Mr. Bhula objects to the mischaracterization of the event that occurred on March 5, 2019.  During the pretend drug deal playacted by DEA agents using packaged flour in the lobby of the motel, Mr. Bhula was working behind a chest-high reception desk that was further separated from the agents by a plexiglass divider.  He was not watching what they were pretending to do when they conducted their fake drug deal. He was working at his desk.  He never told them that it was no problem for them to "be doing this at the motel". When one of the DEA agents said "So, if he has any problems, he comes and sees you" Mr. Bhula responded with "no problems". That was not an endorsement of any drug trafficking. It was a typical response of someone in a customer service job agreeing with a customer and confirming that he would be available for the guest if he needed anything in the future.

5.   Paragraph 15, Second Objection- Mr. Bhula also objects to any insinuation that he was aware that Michael "Trigger" Avila was selling drugs at the Best Choice Inn and allowed it to continue.   Mr. Bhula was not aware of that when APD apparently conducted a controlled purchase the following day on March 6, 2019.   In April of 2019, Mr. Bhula noticed a large amount of foot traffic entering and leaving Mr. Avila's room, at which time he became suspicious that illegal activity was occurring. Mr. Bhula then evicted him from the property. Eventually Mr. Bhula agreed to let Mr. Avila move back into the Best Choice Inn but was not aware that Mr. Avila was in possession of drugs or if he was engaging in drug trafficking again.

6.   Paragraph 16- Mr. Bhula objects to the allegation that management was aware that Larry Woolridge was selling drugs at the Best Choice Inn.   Mr. Bhula was not aware that Mr. Woolridge was selling drugs at the motel and received no profit from it.   Mr. Woolridge was required to pay visitor fees like all other residents of the motel but the fees were not dependent on drug trafficking.   Rather, the visitor fees were implemented in an effort to discourage excessive guests and to clean up the property.

7.   Paragraph 17- Mr. Bhula has no personal knowledge of the alleged drug dealings described in paragraph 17.

8.   Paragraph 18- Mr. Bhula denies any knowledge of this controlled purchase of drugs from Mr. Avila.   Mr. Bhula further asserts that when he became aware the Mr. Avila was selling drugs at the Best Choice Inn, he was evicted from the property.

9.   Paragraph 19- Mr. Bhula objects to the misrepresentation of facts as described in this paragraph. While it may be true that Jane Doe 2 made self-serving statements to the police on that date, the circumstances under which those statements were made are

important and are completely excluded from this paragraph.  Jane Doe 2, a long-time drug addict and repeat criminal, was arrested that day for possession of heroin.  In a desperate attempt to avoid arrest for a felony offense and being forced off of drugs, Jane Doe 2 gave a statement riddled with lies.  The interview began with Jane Doe 2 not being able to identify who the president of the United States was, she then minimized her criminal record and her drug use, admitted to being a prostitute before living at the Best Choice Inn, admitted that she never dealt with Mr. Bhula (a.k.a. Rocky), she didn't have his phone number and she didn't even know his last name. She also said he was from India (he is from South Africa).  She also acknowledged that Mr. Bhula was not involved in the "dope stuff" and that she didn't know if he even knew what was going on at the motel.

10. Paragraph 19, Second Objection-  Mr. Bhula denies any knowledge that "the women were not being permitted to take drugs off the property and were instead being required to get high in their rooms."

11. Paragraphs 21 to 24- Mr. Bhula denies any knowledge of drug possession or drug trafficking by Mr. Horton or Mr. Craft.  Mr. Bhula was never inside Mr. Horton's vehicle and had no reason to know what Mr. Horton transported in the vehicle. Mr. Bhula never entered the motel rooms occupied by Mr. Horton or Mr. Craft and had no way of knowing what they stored in their private rooms.

12. Paragraph 25- Mr. Bhula objects to the misrepresentation provided in this paragraph. Many of the long-term residents at the Best Choice Inn (the individuals being accused of drug trafficking and prostitution) did not allow housekeeping into their rooms.  The condoms and drug paraphernalia located by housekeeping were often located when

the rooms were being "turned over", i.e., cleaned after the guests had already checked out.  Mr. Bhula's "unremarkable" response to being shown these items was likely due to the fact that he did not have any recourse for guests that had already vacated the property.  Further, condoms are not evidence of criminal activity. They are evidence of sex.  Counsel would submit that sexual activity is a common place activity in all motels and hotels.

13. Paragraph 28- Mr. Bhula acknowledges that Mr. Patel returned to Albuquerque so that they both could meet with City of Albuquerque officials to brainstorm ways to clean the property up.  Among the actions taken while Mr. Bhula managed the property was the installation of additional video cameras, building up a wall behind the property to stop foot traffic, calling the police (911) for assistance and meeting with officers when they responded, requiring photo identification to rent a room, trying to prevent unauthorized guests on the property and evicting guests that caused problems or were disruptive.

14.  Paragraph 30- This paragraph is a reiteration of the misrepresentations and factual inaccuracies previously addressed in these objections.   Mr. Bhula maintains his previous objections to these statements.

15. Paragraph 31- This paragraph is referencing the custodial statement made by Jane Doe 2 that was previously described in paragraph 19.  For the reasons previously stated in response to paragraph 19, Mr. Bhula objects to these allegations. Mr. Bhula further objects to the allegations made in paragraph 31 being summarized on two separate occasions within the "Offense Conduct" section, thereby given the false impression that these statements were made by two different women when in fact

paragraphs 19 and 31 are highly selective summaries of the same statement made by the same person.

16. Paragraph 32- This is the same information regarding drug quantities that was previously discussed in paragraphs 21 to 24. Mr. Bhula maintains the same objections to these allegations, denies any knowledge of these drugs, and further objects to this being repeated in the "Offense Conduct" as being repetitive and misleading.

17. Paragraph 33- Mr. Bhula objects to the drug weight reported in this paragraph. As mentioned in response to previous paragraphs, Mr. Bhula had no knowledge of these drugs.  Further, some of these drugs were not even located at the Best Choice Inn and there is no evidence that they were related to the offense for which Mr. Bhula pled guilty and is being sentenced for.

18. Paragraph 33, Second Objection- Mr. Bhula had no knowledge of any firearms in the possession of Mr. Horton or Mr. Craft.  Notably, Mr. Bhula was not found in possession of any firearms but that fact has been left out of the PSR.

19. Paragraph 34- Mr. Bhula objects to his designation as an organizer/leader of the criminal activity of five or more individuals.  This objection will be further addressed in detail below.

**B.  The Alleged "Offense Behavior Not Part of Relevant Conduct"**

Paragraphs 49 through 63 of the PSR pick up where the alleged "Relevant Conduct" leaves off, describing an alleged human trafficking ring that confuses the operation of a legitimate business (a motel) with sex trafficking.  While the allegations are fantastical, they are also without merit and would not have resulted in convictions if this matter had proceeded to trial.  That is likely why the government, after four years of heavy litigation,

offered the global plea deal to all remaining defendants which dismisses all charges relating to the alleged sex trafficking.  Unfortunately, the PSR takes the allegations made by the "Jane Does" and repeats them as if they are proven fact. They are not.  Mr. Bhula objects generally to the repeating of these unsubstantiated and highly questionable allegations in the PSR.  He further raises the following objections specifically:

20. Paragraph 49- Mr. Bhula denies any involvement in any sex trafficking.  He further denies that he engaged in any force, threats, fraud or coercion to cause anyone to engage in sex trafficking.  Mr. Bhula never targeted or recruited anyone to stay at the Best Choice Inn, let alone "women with limited options, such as drug addicted prostitutes".  To the contrary, Mr. Bhula often felt compassion for these women, which is why he would rent rooms to them when other motels wouldn't.  He further disputes that the motel benefitted financially from sex trafficking, as the motel was not involved in sex trafficking.  He also denies the allegations that proceeds from sex trafficking were laundered by comingling the funds with legitimate business proceeds.  Mr. Bhula would point out that a highly experienced forensic accountant, Janet McHard, reviewed all available records and found no evidence of money laundering.

21. Paragraph 50- Mr. Bhula objects to the misrepresentations included in this paragraph.  Specifically, an unbiased and thorough review of the evidence would have revealed that when visitors' fees were being charged at the Best Choice Inn, all guests were subject to them.  It is false to state that only women were assessed the visitor's fees.  Further, the women were not closely watch by management.  Mr. Bhula installed video surveillance cameras on the entire property so that management could monitor

the entire property, not just the women. Further, when people would enter the property, their purpose for being there was not questioned by management so there was no way of knowing whether someone was a "John".

22. Paragraph 50, Second Objection- Mr. Bhula objects to the mischaracterization that the women were "kicked out of their rooms, and their personal belongings were kept until they earned enough money to buy their way back in." As is abundantly clear by now, the Best Choice Inn was a motel. The business model of a motel is to provide limited access to a property for a fee. If guests cannot pay the fee, they are denied access to the property. The government's own purported hotel industries expert, Michelle Dressler, acknowledged that motels and hotels will evict guests if they cannot pay their rental fees.[1]  Like all guests at the Best Choice Inn, the "Jane Does" were required to pay a rental fee to stay at the motel.  All guests could elect a nightly, weekly or monthly fee, with longer term stays resulting in discounted rates.  If a guest did not pay their rental fees, they were not permitted to stay at the motel.  Many of the guests of the Best Choice Inn, including the "Jane Does" tended to stay at the motel for extended durations of time.  As a result, they collected more personal property in their rooms than would be typically seen in a hotel or motel that sees guests stay for limited durations.  When these guests did not pay their rental fees and were banned from the property, they had a choice.  They could pack up all of their belongings and leave the property by check-out time (12:00 p.m.), or they could leave their property in the room with the plan to return later and pay the rental fees.  When the guests

_____

[1] Defendants challenged Ms. Dressler's qualifications as an expert on other grounds and the Court ultimately granted defendants' Motion in Limine to Exclude Expert Testimony. [Doc. 301]

chose the second option, they would have a grace period until 2:00 p.m. to pay the next night's rent without additional costs. After 2:00 p.m. late fees would be added to offset the risk the motel took by keeping the room "reserved" for that guest without receiving the rent. The motel would often keep these rooms "reserved" for their guests for several days without receiving payment, as a courtesy to those guests. If the guests did not return after a period of time, the motel was forced to clean the rooms and remove the personal property so they could rent to other people. As a courtesy, the motel would often keep the personal property stored for the guest to retrieve when they were able. However, if the guest did not return within a reasonable amount of time, the property was deemed abandoned and would be discarded, sold to offset unpaid rental fees, or donated to people in need. When a guest elected to leave their property in their room without paying rent, they were always permitted by management to enter the room to retrieve personal items, change clothing, pack up their property, etc. They were not permitted to loiter on the property however, without paying their rental fees. How the guests, including the Jane Does, worked to earn money was outside the knowledge of Mr. Bhula. If the Jane Does elected to earn money by working as prostitutes, that was solely their choice and not something Mr. Bhula had knowledge of or inquired into. Mr. Bhula did nothing to discourage or prevent any of his guests from obtaining legitimate jobs.

23. Paragraph 51- Mr. Bhula objects to the statement that "the DEA engaged in several undercover drug deals with a woman, identified as Jane Doe 1" because this fails to provide necessary context and mischaracterizes the drug deals. The drug deals referenced in this paragraph all occurred at locations away from the Best Choice Inn.

The only connection to the motel was the fact that Jane Doe 1 was renting a room there. While a guest at the motel, Jane Doe 1 elected to take an undercover agent to a home in Corrales for the purpose of drug trafficking. Further, Mr. Bhula had no knowledge of Jane Doe 1's involvement in the illegal drug trade.

24. Paragraph 52- Mr. Bhula objects to the unfounded statement that he would hide women in his office. Mr. Bhula requests that the government identify these alleged hidden women. Mr. Bhula also challenges the credibility of Jane Doe 1's statements and would like to point out that she was called to testify during an evidentiary hearing before this Court, during which she proved to be a very unreliable witness and was clearly under the influence of drugs while testifying.

25. Paragraph 53- Mr. Bhula denies knowing that Jane Doe 3 was a prostitute and denies charging her a fixed daily fee for "servicing Johns".

26. Paragraph 55- The alleged "hand-to-hand drug transaction" described in this paragraph is the same fake, undercover drug transaction described in paragraph 15 of the PSR.  Mr. Bhula maintains the same objections to paragraph 55 as previously discussed above in reference to paragraph 15.

27. Paragraph 56- Mr. Bhula denies that it was made clear to him that the women who would be staying in the agent's room would be prostitutes.  He also denies that he told the agent to just pay the "John" fees. Mr. Bhula never said that and did not even know what a "John" was at the time.  Mr. Bhula would note that he is from South Africa and English is not his native language.  While he speaks some English, street slang such as terms like "the track" and "Johns" were not a part of his vernacular during the charging period of this case.

28. Paragraph 57- Mr. Bhula objects to the allegation that he discussed the woman working out of her room. He acknowledges that he may have advised her that the motel charges a fee for unregistered visitors but disputes that it was a fee for "Johns". The visitor's fee was used as a deterrent to reduce the number of unregistered people that came onto the property.  Again, Mr. Bhula also denies using the word "John".

29. Paragraph 58- Mr. Bhula provided the officers with a long list of the rooms that were being occupied by females staying over at the motel. That was his understanding of what they wanted.  He would also like to point out that the officers did not find any evidence that any women were being held against their will and drugged.  To the contrary, every woman that they spoke with acknowledged that they were there of their own volition and were safe.

30. Paragraph 59- This paragraph is referencing the custodial statement made by Jane Doe 2 that was previously described in paragraphs 19 and 31 under the "Offense Conduct" section of the PSR.  For the reasons previously stated in response to paragraphs 19 and 31, Mr. Bhula objects to these allegations. Mr. Bhula further objects to allegations made in paragraph 59 being summarized for a third time in the PSR. Mr. Bhula also reiterates that the summary provided in paragraph 59, as well as paragraph 19 and 31, are highly selective, exclude the exculpatory statements made, and are not credible.

31.  Paragraph 60- These statements are from the same interview referenced in paragraph 19. Mr. Bhula maintains his objections as previously stated above.

As described in detail above, Mr. Bhula raises numerous objections to the alleged facts as summarized in both the "Offense Conduct" and "Other Behavior Not Part of

Relevant Conduct".  Important context is omitted from the summaries, the statements of discredited witnesses are treated as verified truth and exculpatory evidence is excluded. Mr. Bhula requests an evidentiary hearing wherein the government is required to establish by a preponderance of the evidence that these allegations are accurate. Baring that, Mr. Bhula requests that these allegations be stuck from the PSR or otherwise modified to include necessary context and clarification.

## II.      OBJECTION TO BASE OFFENSE LEVEL

The PSR identifies the base offense level as a "34" due in large part to the drugs that are being attributed to Mr. Bhula through the alleged conspiracy.  *See* PSR at ¶ 39.  As stated above, Mr. Bhula denies being involved in any criminal conspiracy.  Most of the evidence cited as proof of a conspiracy is just evidence of a legitimate motel being operated.

U.S.S.G. § 1B1.3(a)(1)(B) defines relevant conduct in the case of a jointly undertaken criminal activity as all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity.  It is the government's burden to establish these factors by a preponderance of the evidence. Relevant conduct for purposes of sentencing is not necessarily the same for every alleged participant in a conspiracy. The fact that some members of an alleged conspiracy may have been in possession of substantial amounts of narcotics does not automatically permit attribution of that amount to other members of that alleged conspiracy.  Rather, the pertinent question is what acts and omissions was the particular defendant personally involved with and what acts of other co-conspirators were reasonably foreseeable to the defendant and occurred in furtherance of the conspiracy.  *United States v. Evans*, 970 F.2d 663 (10th Cir. 1992).

Mr. Bhula objects to the drug quantities being attributed to him in paragraph 39 and submits that there is no evidence that he was aware that these drugs were being trafficked, they are not in furtherance of any joint criminal undertaking and that they were not reasonably foreseeable to him.

Mr. Bhula further objects to the two-level enhancement applied under § 2D1.1(b)(1) for possession of a dangerous weapon.  No evidence has been presented by the government or mentioned in the PSR that indicates Mr. Bhula had any knowledge that Mr. Craft and Mr. Horton were in possession of firearms or that it was reasonably foreseeable to him that they possessed firearms.  There is also zero evidence that Mr. Bhula was ever in possession of any firearms.

Given the grave concerns Mr. Bhula has previously raised regarding the allegations being relied upon by the probation office in determining the offense level, Mr. Bhula requests an evidentiary hearing on this matter.

### III.    OBJECTION TO ENHANCEMENT AS AN ORGANIZER OR LEADER

In paragraph 4, the probation department determines that Mr. Bhula should receive an adjustment for role in the offense, increasing his offense level by four levels.  The probation department alleges that Mr. Bhula was "an organizer or leader of the criminal activity that involved five or more participants or was otherwise extensive, warranting a four-level enhancement under Section 3B1.1(a)."  PSR, ¶42. Mr. Bhula objects to this adjustment as there is no evidence to show that he was an "organizer or leader" of the criminal activity involved in the count to which Mr. Bhula pled.  Moreover, Mr. Bhula actually qualifies for a minor role departure and requests that the Court depart two-levels under §3B1.2

As an initial matter, the PSR relies on investigative reports and conversations with the case agent when making his determination that Mr. Bhula was considered an "organizer or

leader." These documents are law enforcement reports and contain information that is speculative and far beyond the facts to which Mr. Bhula pled. When determining Mr. Bhula's role in the offense and his request for a departure, Mr. Bhula maintains that the facts the Court should consider are only those contained within the factual basis of his plea agreement. *See* Doc. 579, pp. 3-4. Mr. Bhula did not admit or swear to the alleged facts listed in paragraphs 11-33 and the mere fact that they are contained within reports does not make them reliable. As described in detail above, there are numerous reasons to question the veracity of these allegations. However, Mr. Bhula maintains that even if the Court were to rely on those alleged facts, he still does not meet the criteria for an adjustment as an organizer or leader.

The PSR boldly states, without justification, "both Patel and Bhula were organizers/leaders in the criminal activity that involved five or more participants or was otherwise extensive." *See* PSR ¶ 34. However, the PSR does not engage in any analysis of the Section 3B1.1 factors that the United States Sentencing Commission describes in Application Note 4 to determine whether a defendant is an organizer, leader, manager, or supervisor in the criminal activity. Specifically, the non-exhaustive list of factors the Court is to consider include:

> the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

USSG § 3B1.1, comment. (n.4). It is clear from this list of factors that an "organizer" or "leader" must exercise a significant degree of control and decision-making authority in the criminal activity. There is no evidence that Mr. Bhula exercised any decision-making authority in relation to the criminal activity taking place at the Best Choice Inn. What is also clear from

case law is that an individual's title in and of itself is not controlling in this determination.  See

*United States v. Rubio-Sepulveda*, 781 Fed. Appx. 769, \*772, 2019 U.S. App. LEXIS 22054,

\*\*4.  In the instant case Mr. Bhula was labeled as an on-site manager, *see* Doc. 579, p. 4,

however this label has no bearing on his actual role or participation in the offense.

In *United States v. Litchfield*, 959 F. 2d 1514 (10th Cir. 1992), the court describes the key

determinants in the applicability of §3B1.1 and that that defendant's sentence should not have

been enhanced.  The Court stated that although the district court may have rightly determined

that that defendant was "deeply involved in and essential to the success of the fraud and equated

that finding with an organizer or leader," *id*. at 1522, the court ultimately held that control and

organization over others involved is necessary.  The court stated:

> Our cases have also held that to find a defendant an organizer or leader under 3B1.1 there
> must be elements of control or organization of other people. In *United States v. Reid*, 911
> F.2d 1456 (10th Cir. 1990), *cert. denied*, 112 L. Ed. 2d 1074, 111 S.Ct. 990 (1991), we
> stated:
>
> > Key determinants of the applicability of 3B1.1 are control or organization: "the
> > defendant must have exercised some degree of control over others involved in the
> > commission of the offense or he must have been responsible for organizing others
> > for the purpose of carrying out the crime. This requirement is implicit in the terms
> > '**organizer**, leader, manager and supervisor,' each of which suggests the presence
> > of underlings or subordinates."
>
> *Id*. at 1464 (quoting *United States v. Fuller*, 897 F.2d 1217, 1220 (1st Cir
> 1990));  *accord Smith*, slip op. at 15 ("To support enhancement under [3B1.1(**a**)], the
> government must show that each member of the organization is answerable to the
> defendant and is under his continuing control."); *see also United States v. Mares-Molina*,
> 913 F.2d 770, 773 (9th Cir. 1990) ("some degree of control or organizational authority
> over others is required in order for section 3B1.1 to apply"); *United States v. DeCicco*,
> 899 F.2d 1531, 1535 (7th Cir. 1990) ("Sentencing Commission intended 3B1.1 to apply
> only to situations where the offender organizes or leads criminally responsible
> individuals.").

*Id*. at 1522.  The court went on to say that even if that defendant were deeply involved in the

scheme, it was relevant information but not conclusive.  That defendant did not organize or initiate the original scheme, exercise any decision- making authority over the other participants, recruit other participants, or even share in the profits.  Therefore, his sentence should have never been enhanced.

Additionally, in *Rubio-Sepulveda*, the court also held that the district court erred in applying the enhancement under 3B1.1 for being an organizer or a leader.  In that case, the defendant pled guilty to a drug and money-laundering conspiracy and the district court held that since he was a dispatcher and had "served approximately 25 street-level distributors a day with heroin" *Rubio-Sepulveda*, 781 Fed. Appx. at *771, he qualified as an organizer or leader.  The court stated that to determine if a defendant qualifies as an organizer or leader, the appellate court must look beyond whether he simply had some control or authority over others in the conspiracy and instead examine whether there is evidence of a heightened level of leadership and control.  If there is a lack of indicia of this evidence the enhancement is not appropriate, according to the court in *Rubio-Sepulveda*.

There is absolutely no evidence that Mr. Bhula acted as an organizer or leader and the PSR mistakenly recommends this enhancement.  When applying the list of factors in the commentary, Mr. Bhula's activity meets none of these factors.  Within the factual basis of his plea agreement, Mr. Bhula is characterized as a manager and on-site manager who knew of drug activity within the premises of the hotel.  Mr. Bhula admits to knowing that there was "rampant" drug use and distribution of drug within the hotel, Doc. 579 at 4.  This is it.  Mere knowledge of crimes occurring and essentially turning a blind eye do not qualify as factors that make Mr. Bhula an organizer or a leader.  Probation does not point to any decision-making authority exercised by Mr. Bhula because there was none.  Neither did he recruit accomplices, share in any

profits beyond his role as a hotel manager or organize or plan any of this drug activity.  At no time did Mr. Bhula exercise control or authority over others involved in the drug activity or any other criminal activity at the hotel.

Mr. Bhula's title as a manager is not enough according to the guideline commentary and *Rubio-Sepulveda*.  There must be evidence of control and authority.  Probation cannot point to any examples of Mr. Bhula exercising any control or decision-making beyond allowing others to engage in criminal activity.  Even if this were a factor to be considered, as in *Litchfield*, where the court acknowledged that defendant was essential to the success of the fraudulent scheme involved in that case, it is still not enough.  According to *Litchfield*, others would have had to be answering to Mr. Bhula or Mr. Bhula exercising some control over others involved.  As in *Rubio-Sepulveda*, there must be decision-making authority or control over another.  That never happened and probation cannot to any evidence to the contrary.  The Court should sustain Mr. Bhula's objection.

**Mitigating Role**

Not only should Mr. Bhula's offense level not be enhanced for having an aggravating role, he should in fact receive a minor role departure.  Under the Guidelines, the defendant's sentencing range should be reduced if he or she had a mitigated role in the offense.  As relevant here, §3B1.2 provides: "If the defendant was a minor participant in any criminal activity, decrease by 2 levels."  U.S.S.G. § 3B1.2(b).  This reduction applies to a defendant "who is less culpable than most other participants, but whose role could not be described as minimal."  U.S.S.G. § 3B1.2 cmt. n.5.  And a "participant" is "a person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.2 cmt. n.1 (incorporating the definition from section 3B1.1 cmt. n.1).

19

Thus, under section 3B1.2, when the defendant "plays a part in committing the offense that makes him [or her] substantially less culpable than the average participant," he or she is entitled to a minor-role reduction.  U.S.S.G. § 3B1.2 cmt. n.3.  Importantly, this culpability comparison "is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), *i.e.*, all conduct included under § 1B1.3(a)(1)-(4), and not solely on the basis of the elements and acts cited in the count of conviction."  U.S.S.G. Ch. 3, Pt. A, Introductory Commentary.  That is, when evaluating the defendant's relative culpability – his or her "role" – the court must consider "all reasonably foreseeable acts and omissions *of others* in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction [and] in preparation for that offense[.]" §U.S.S.G. § 1B1.3(a)(1)(B) (emphasis added).

Accordingly, "[a] defendant who is accountable . . . only for the conduct in which the defendant personally was involved and who performs a limited function in concerted criminal activity is not precluded from consideration for an adjustment under this guideline."  U.S.S.G. § 3B1.2 cmt. n.3.  For instance, "a defendant who is convicted of a drug trafficking offense, whose role in that offense was limited to transporting or storing drugs and who is accountable under §§ 1B1.3 only for the quantity of drugs the defendant personally transported or stored" may properly qualify for the minor role reduction.  *Id.*

Moreover, "prosecutors need not identify, arrest, or try together all 'participants' in a scheme (and thus transform them into 'defendants') in order for the district court to consider their conduct when evaluating a particular defendant's relative role."  *Rojas-Millan*, 234 F.3d 464, 473.  Instead, "[this Court] read[s] § 3B1.2 as instructing [district] courts to look beyond the individuals brought before it to the overall criminal scheme when determining whether a particular defendant is a minor participant in the criminal scheme."  *Id.*

20

The commentary to U.S.S.G. § 3B1.2 was amended on November 1, 2015, in response to the Sentencing Commission's finding that "mitigating role is applied inconsistently and more sparingly than the commission intended."  USSG app. C amend. 794 (2015).  With the factors Amendment 794 added to the application note of §3B1.2, the Sentencing Commission sought to provide further clarity as to the application of minor role.  The Commission was concerned that courts were being discouraged from applying the adjustment in otherwise appropriate circumstances.  *Id*.

Among the changes to the application note, the commission added a non-exhaustive list of factors the court should consider when applying the adjustment. The Commission determined that "a list of factors will give a common framework for determining whether to apply a mitigating role adjustment (and, if so, the amount of the adjustment) and will help promote consistency."  *Id*. The new commentary also provides as an example "that a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for a mitigating role." *Id*.  As a result of Amendment 794, the Ninth Circuit issued an instructive opinion in *Quintero-Leyva*, stating:

> We reverse and remand for re-sentencing so the district court can consider the factors now listed in amended §3B1.2.  On remand the district court "should consider" the factors identified in Amendment 794: (I) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and (v) the degree to which the defendant stood to benefit from the criminal activity.

*Quintero-Leyva*, 823 F.3d at 523.  These factors clarify the analysis the court is to undertake both when assessing Mr. Bhula's culpability and when determining who the average

participant is.  The district court must consider all of the factors in the application note, none can be ignored.

The district court must compare Mr. Bhula to other likely participants in this criminal activity, not to typical offenders, not to co-defendants, nor to other criminal defendants of the same type. *See* USSG app. C amend 794 (2015).  Other likely participants include high-level participants and are not limited to people who can be specifically identified, rather the question is whether there is enough evidence that their existence is "likely." *See Rojas-Millan*, 234 F.3d 464, 472; *Webster*, 996 F.2d 209, 211-12.

When analyzing Mr. Bhula's role in terms of Application Note 3(C) for §3B1.2, he plainly meets the factors the Sentencing Commission deems important and determinative.  As to the degree to which Mr. Bhula understood the scope and structure of the criminal activity, Mr. Bhula knew there was drug activity within the Best Choice Inn.  There is no evidence to indicate he knew anything more than others were using and eventually, perhaps selling drugs on the premises.  He, himself, did not engage in any of this activity.  Mr. Bhula was not involved in any planning of this illegal activity and once again, had no decision-making authority.  Other than witnessing the suspicious activity of others, Mr. Bhula did not participate, nor was he responsible for this activity and his discretion was minimal.  Mr. Bhula himself did not benefit from the drug activity on premises.  His only benefit was in his lawful capacity as manager of the motel.  Mr. Bhula, when compared to those who truly were engaging in drug-related criminal activity, had a minor role and should receive a two-level downward departure.

## IV.    OBJECTION TO UPWARD DEPARTURE

Although the PSR ultimately declines to recommend an upward departure under U.S.S.G. § 5K2.21, the probation office included arguments in favor of it. Thus, counsel feels

obligated to respond to these unfounded assertions.

While it is true that Mr. Bhula was initially indicted on multiple counts, including allegations that he was involved in a conspiracy to commit sex trafficking, all of these charges are ultimately being dismissed by way of plea agreement not only against Mr. Bhula, but all of the co-defendants.  Mr. Bhula would submit that after four years of heavy litigation, which included multiple evidentiary hearings, dozens of motions, and the testimony of countless experts, the government simply did not have sufficient evidence to obtain convictions on these charges.  As was described in detail in previous sections of this pleading, the evidence of sex trafficking is dubious at best and reliant upon the incredulous statements of drug addicts under threat of criminal prosecution for serious felony offenses.  Thus, Mr. Bhula objects to any consideration of these dismissed charges in determining the appropriate sentence in this matter.

## V.    ADDITIONAL OBJECTIONS

Mr. Bhula objects to the characterization in paragraph 77 that describes him as being in good physical health.  *See* PSR at ¶ 77.  To the contrary, Mr. Bhula is in poor health in large part due to the completely substandard medical care that he has received since being incarcerated at Cibola County Correctional Center.  In the summer of 2021, Mr. Bhula noticed a hard lump on the inside of his left cheek.  Despite reporting this to medical staff and requesting treatment, the lump was allowed to grow without medical intervention for several months until the lump (which was actually an aggressive form of cancer) erupted through his cheek and was protruding out of his mouth.  Eventually in 2022 Mr. Bhula received surgery, radiation and chemotherapy for the cancer, but as a result of the significant delay in treatment the tumor grew much larger and caused far more damage than would have occurred if he had received timely medical treatment.

Following the surgery and to this day, Mr. Bhula cannot eat solid foods.  For approximately a year following his surgery, Mr. Bhula was given nothing but Ensure protein shakes by the jail to meet all his nutritional needs.  Unfortunately, Mr. Bhula was not being given enough protein shakes to sustain his weight and was slowly starving.  He lost a significant amount of weight which caused him to frequently be confused and dizzy and resulted in him losing consciousness on a number of occasions.  In April of 2023 an independent oncologist reviewing his medical records noticed that Mr. Bhula was not being given adequate nutrition and alerted undersigned counsel.  Counsel immediately relayed these concerns to staff at CCCC and Mr. Bhula's diet was adjusted to increase his daily caloric intake.  Since then Mr. Bhula has put on over 30 pounds and although he is still underweight, the dizziness, mental confusion and other side effects are beginning to subside.  However, Mr. Bhula's health is still not good as he continues to suffer the side effects from the cancer, the treatment following the cancer and his near starvation at CCCC.

## VI.   SPECIFIC OFFENDER CHARACTERISTICS

Paragraph 104 of the PSR reiterates the same unfounded and unreliable allegations that are mentioned in numerous other paragraphs of the PSR.  Mr. Bhula maintains his aforementioned objections to these allegations.

Mr. Bhula further submits that the following specific characteristics should also be considered as reasons to mitigate the period of incarceration handed down in this matter:

A.  Mr. Bhula is a citizen of South Africa. At the time of his arrest, he was in the United States lawfully with a work visa.  That visa has long since expired and he expects to be deported back to South Africa upon his release from custody in this matter.  His deportation is grounds to vary downward as he is facing a punishment that most defendants do not face, permanent removal from the United States and separation from

his only child.  *See United States v. Mendez-Velarde*, 798 F.Supp. 2d 1249 (D.N.M. 2011).

B. As described above, Mr. Bhula has experienced significant medical problems while incarcerated on this matter.  The medical care that he received was significantly delayed and resulted in a far more invasive surgery than otherwise would have been necessary. As a result, Mr. Bhula is permanently disfigured, cannot communicate well and has been forced to consume only liquids and very soft foods since February of 2022.  He was denied necessary nutrition for approximately a year after the surgery, which has delayed any reconstructive surgery to his face because he is too underweight to undergo surgery. Mr. Bhula has been advised that even after reconstructive surgery he may never be able to speak well again and his ability to eat solid foods is permanently comprised (although he remains optimistic that will improve).  Pursuant to U.S.S.G. § 5H1.4, a downward departure may be warranted if a defendant's physical condition or appearance is impaired to an unusual degree.  Given that a sizeable portion of Mr. Bhula's face was removed, resulting in permanent disfigurement that causes him to drool almost constantly and requires that he carry a rag around with him everywhere he goes to wipe his face, along with all of the other complications he has suffered, Mr. bhula respectfully submits that a downward departure is warranted.

**VII. CONCLUSION**

Based upon the aforementioned factors and circumstances, Mr. Bhula asks that the Court strike the objectional portions from the PSR, to add missing information necessary for context, to include omitted exculpatory evidence, to modify the base offense level to properly reflect Mr. Bhula's actual involvement in any alleged conspiracy, to grant a two-level departure as a minor

role participant, to reject the proposed enhancement for possession of a firearm, to reject any upward departure pursuant to § 5K2.21, to grant a variance downward due to his imminent deportation, to grant a downward departure due to his poor physical condition pursuant §5H1.4 and for any other relief that the Court finds to be meritorious and appropriate given all of the facts and circumstances in this matter.

Respectfully submitted,

LAW OFFICES OF Nicole W. Moss, LLC

*/s/ Nicole W. Moss*
Nicole W. Moss
514 Marble Ave. NW
Albuquerque, NM 87102
(505) 244-0950

LAW OFFICES OF SARAH M. GORMAN

*/s/ Sarah M. Gorman*
Sarah M. Gorman
1201 Lomas Blvd. NW, Suite A
Albuquerque, NM 87102
(505) 243-5442

CERTIFICATE OF SERVICE

I hereby certify that on the 6th of October, 2023, I filed the foregoing pleading via CM-ECF, causing all registered parties to be served.

*/s/ Nicole W Moss*
Nicole W. Moss

26