**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**vs.**                                                             **No. 19-1631-DHU**

**KAMAL BHULA, et al.**

        **Defendant.**

**DEFENDANT KAMAL BHULA'S SENTENCING MEMORANDUM**

COMES NOW, Defendant Kamal Bhula, by and through counsel of record Nicole W. Moss and Sarah M. Gorman, and hereby respectfully submits his sentencing memo and states as follows:

## I.        INTRODUCTION

Mr. Bhula comes before the Court after spending over four and a half years in custody for his first, and only, criminal case.  Mr. Bhula has never been in trouble with the law before and his incarceration to date has been exceptionally difficult, to the point that it has almost killed him.  He was indicted with numerous charges that were ultimately dismissed as part of a global plea and now faces sentencing on only one count, Maintaining a Drug-involved Premises and Aiding and Abetting contrary to 21 U.S.C. §§856(a) and 18 U.S.C. § 2 for conduct that occurred while he was trying to run a legitimate business, a motel, in what is likely Albuquerque's most crime-ridden neighborhood.  For the reasons detailed below, Mr. Bhula respectfully requests that the Court impose a sentence of credit time served (1,743 days) as the just and reasonable sentence in this matter.

## II.        BACKGROUND INFORMATION

1

### A. Mr. Kamal Bhula

Mr. Bhula was born and raised in Johannesburg, South Africa. He is the youngest of two boys, with a large extended family of uncles, aunts and cousins. A number of family members and friends from South Africa have written letters of support for the Court's consideration in this matter. *See* Exhibit A. Those letters provide a snapshot of the man that Mr. Bhula is. He is described by those who know him best as kind, compassionate, selfless, thoughtful, honest, humble and a hard worker. *See id.* Mr. Bhula's uncle, Oopesh Bhula further stated that "[i]t is truly disheartening to see Kamal in these unfortunate circumstances, as his kind and gentle soul may have led him to misplaced trust. While not excusing any wrongdoing, I believe this situation is entirely out of character for him." *See* Exhibit A, p. 9.

Mr. Bhula's family, while not wealthy, lived modestly but comfortably in a small home that his father still resides in. Mr. Bhula held various jobs since he was a teenager. He attended university for one year, studying mechanical engineering, but left school so he could obtain a job and support his young wife and his parents. Prior to moving to the United States, he was the co-owner of an ice factory with his older brother. He sold his share in the factory when he and his wife, Bhumika Bhula, decided to come to the United States.

Mr. Bhula was married to his wife Bhumika for over twenty-one years. Like many young couples, they dreamed of having children together. Unfortunately, they struggled with infertility for many years, which was a factor in their decision to come to the United States. They hoped to obtain fertility treatments in the U.S. that were not available in South Africa, so that they could have children. They came to the United States in 2015 and resided briefly in Texas and then in Colorado until March of 2018. Mr. Bhula obtained a work visa shortly after coming to the U.S. and worked at various motels until moving to Albuquerque to run the Best

Choice Inn ("BCI").  It was while they were still living in Colorado that Mr. and Mrs. Bhula found out that they were expecting their first baby.  They were overjoyed at the news and were very excited to finally become parents after many years of infertility.

Mr. Bhula's first and only child, was born on June 21, 2018.  Around that time, Mr. and Mrs. Bhula moved into a home in Northeast Heights of Albuquerque.  Mrs. Bhula stayed home with the baby while Mr. Bhula continued managing the motel, typically working from 6:00 a.m. to 2:00 p.m.  The afternoons and evenings were spent with his family.  Mr. Bhula loved being a father and especially enjoyed holding his baby, playing with him and taking him for walks around their neighborhood.  The year after his son was born until he was arrested on June 18, 2019, was the best year of Mr. Bhula's life because he was finally able to be a father.

 

Following Mr. Bhula's arrest on June 18, 2019, he was remanded into the custody of the United States Marshal's Service where he has remained ever since.  As of the date of sentencing on March 26, 2024, Mr. Bhula will have been detained for 1,743 days.  More significantly, he has missed every single one of his son's birthdays.  Mr. Bhula has not seen his son in person in over four years.  He has a very limited relationship with his son because he can only visit him via

telephone calls and video visits.  Mr. Bhula and his wife have divorced since Mr. Bhula was incarcerated.  Mr. Bhula sought the divorce to protect his wife from any collateral consequences of his incarceration as Mrs. Bhula is seeking asylum in the United States.  Despite the divorce, Mrs. Bhula continues to support Mr. Bhula as much as she can and wants him to have a relationship with their son.

At the time of his arrest, Mr. Bhula was in the United States lawfully with a work visa and a valid South African passport.  Since being incarcerated Mr. Bhula's work visa and passport have expired and he was barred from applying for new ones due to his incarceration.  As a result, it is expected that upon his release from custody, Mr. Bhula will be detained by immigration authorities and deported from the United States to South Africa.  Mr. Bhula will never be permitted to re-enter the United States and thus, his relationship with his son will be further limited.  However, Mr. Bhula looks forward to returning to South Africa where he has a large, supportive family waiting for him.

### B.  The Cancer Diagnosis

In the summer of 2021, while being detained on this case, Mr. Bhula noticed a lump inside his mouth. By July of 2021 that lump had continued growing and was causing facial swelling and pain.  Mr. Bhula began requesting medical attention but all that was offered was a quick visit with the dentist at Cibola County Correctional Center (hereinafter "CCCC") at which time the dentist prescribed antibiotics and ibuprofen.  When the lump did not respond to the antibiotics, the dentist prescribed a mouth rinse for Mr. Bhula.  On September 9, 2021, defense counsel saw Mr. Bhula in court during a hearing, at which time the lump was clearly visible on Mr. Bhula's face.  Following that hearing, defense counsel emailed the U.S. Marshals Service to express her concern for Mr. Bhula's health and the lack of medical care that he was receiving.

Eight days later Mr. Bhula was barely able to open his mouth and was given Tylenol and ibuprofen for the pain.  Mr. Bhula remained in serious pain, so three days later he was given a higher dose of ibuprofen.  Medical staff kept telling Mr. Bhula that he would be taken off-site for medical care, so he kept waiting.  The lump continued to grow.

On October 4, 2021, Mr. Bhula was finally seen by an off-site dentist, who noted that he likely had a tumor in his salivary gland and that he needed to be seen by an ear, nose and throat specialist.  Throughout the rest of October the dentist at CCCC continued to treat Mr. Bhula as having a dental issue, despite the fact that the off-site dentist had indicated it was a tumor. CCCC medical staff kept promising that Mr. Bhula would be taken off-site for a CT scan and an MRI.  Mr. Bhula kept waiting and the tumor kept growing.  Mr. Bhula was in constant pain, could barely open his mouth, struggled to eat and his speech was becoming slurred.  On October 28, 2021, defense counsel again contacted the U.S. Marshals requesting that Mr. Bhula receive adequate medical care.  Mr. Bhula also continued to request medical treatment by way of CCCC's "sick call" forms.

Finally on November 8, 2021, Mr. Bhula received an MRI, which confirmed that there were two tumors growing on his face.  A few days later, on November 11, 2021, Mr. Bhula was seen at the National Sinus Institute where he reported increasing swelling of his face, left jaw pain, and an inability to eat on the left side of his mouth.  Mr. Bhula returned to CCCC where he waited for treatment.  On December 2, 2021, the doctor for CCCC, Dr. Ivens, finally acknowledged that Mr. Bhula likely had cancer (a fact that was identified two months prior at the off-site dentist) and requested a referral to the University of New Mexico Cancer Center.  Dr. Ivens's staff delayed submitting the completed referral until December 13, 2021.  The delays continued and a biopsy of Mr. Bhula's tumors was not completed until January 6, 2022, almost

5

six months after Mr. Bhula had initially reported the suspicious lump in his mouth.

By this time, the lump had grown so large that it was protruding from Mr. Bhula's mouth and oozing blood and puss.  Mr. Bhula was in constant pain and had to carry a rag around with him to wipe away the fluids that were leaking from his mouth.  Below are photos taken of Mr. Bhula on December 28, 2021, and again on January 15, 2022:

 

The tumors continued to grow throughout January, causing constant pain for Mr. Bhula and impairing his ability to talk or eat.  The only pain medication provided to Mr. Bhula was over-the-counter medications, which did little to ease his suffering.  At some point in early 2022, defense counsel recalls a foul odor emanating from Mr. Bhula's face, likely caused by the rotting flesh that the tumors were destroying.  Counsel continued documenting Mr. Bhula's wound over the next few weeks, obtaining the following photos on February 7, 2022, and February 18, 2022:

 

Finally on February 22, 2022, Mr. Bhula underwent surgery at the University of New Mexico Hospital, at which time Mr. Bhula's left cheek, left oral commissure, left buccal mucosa and his left hard palate were removed. Most of the teeth on the left side of his mouth also had to be removed. He was in the intensive care unit of the hospital for seven days after his surgery and eventually discharged from the hospital on March 11, 2022. Throughout his hospital stay he was denied any visitors, even from defense counsel. Following his discharge from the hospital he underwent a course of radiation and chemotherapy. He was placed onto a liquid diet of Ensure protein shakes, as he is unable to eat solid foods. Mr. Bhula lost a significant amount of weight following his surgery, was frequently dizzy and started falling often. By early 2023, Mr. Bhula's weight had dropped to 130 pounds, (he weighed over 200 pounds when he was arrested). In February of 2023, an oncologist hired by Mr. Bhula's civil counsel discovered that he was not being provided with adequate nutrition by CCCC. In effect, he was slowly being starved to death by the facility. Mr. Bhula's counsel immediately notified CCCC and Mr. Bhula's protein shakes were increased. After another email to the facility, Mr. Bhula was then provided with

other foods that he could consume including applesauce and oatmeal.  However, due to his low weight and poor nutritional levels, Mr. Bhula could not undergo reconstructive surgery to repair his face.  For the past year Mr. Bhula has been slowly regaining the weight that he lost due to malnutrition and now weighs approximately 185 pounds.  He has been medically cleared to have the reconstructive surgery and was told by his ENT doctor that it had been scheduled.  However, that surgery did not occur due to "transport problems" with the facility.  It is believed that the surgery may be rescheduled in the future.  However, at this point Mr. Bhula has lost all faith in the facility's ability to manage his medical care. Mr. Bhula's family has looked into the possibility of Mr. Bhula obtaining a reconstructive surgery in South Africa and has informed defense counsel it is available.  Thus, Mr. Bhula would request a credit time served sentence so that he may return to his home and seek any additional medical care there.

Mr. Bhula has been advised by his surgeon and a speech pathologist that even following the reconstructive surgery, he will not be able to communicate clearly, and he will still struggle to eat solid foods.  It is anticipated that Mr. Bhula will never be able to speak clearly again, because too much of his face and mouth had to be removed during surgery due to the advanced progression of his cancer.  The reconstructive surgery will only sew up the hole that is currently on his mouth and remove the extraneous flesh on his cheek.  Hopefully though, it will help Mr. Bhula control the drooling that he still experiences and perhaps will reduce the odd looks and stares he gets from people.  Mr. Bhula's vision in his left eye is also very bad now, likely as a result of the cancer and treatments.  He is also missing a lot of teeth, which impacts his ability to eat.  As of the date of filing this memo, however, Mr. Bhula is declared cancer free.

**C.  The Best Choice Inn "BCI"**

In early 2018 the Bhulas were living in Grand Junction, Colorado and working at a motel.

At that time, they were contacted by a cousin of Mrs. Bhula, co-defendant Pragneshkumar Patel (a.k.a. "Pete" Patel) about the opportunity to manage a motel of their own.  Neither Mr. or Mrs. Bhula had ever been to New Mexico before, so Mr. Bhula drove down to Albuquerque and spent one night visiting Mr. Patel and discussing the possibility of the Bhulas taking over the management of the Best Choice Inn.  Although Mr. Bhula spent the night at the BCI during that short trip, he actually did not spend much time at the motel.  Instead, most of his visit was spent with Mr. Patel driving him around the Northeast Heights of Albuquerque, looking at rental houses and even shopping for a used minivan.  In hindsight, Mr. Bhula believes that he was deliberately kept away from the motel so that he did not know how bad the surrounding neighborhood was.

Upon leaving Albuquerque after that brief visit, Mr. Bhula was not convinced that he should move his family to Albuquerque to run the BCI.  After returning to Colorado Mr. Bhula was pressured by the Patel family into taking over management of the motel and Mr. Bhula relented.  At the end of February Mr. and Mrs. Bhula moved to Albuquerque and Mr. Bhula took over management of the BCI on March 1, 2018.  Mrs. Bhula was approximately six and a half months pregnant at the time.

Although Mr. Bhula had worked at motels before, he had never been the manager of one.  He also had no knowledge of Albuquerque and was completely unaware of the crime problems that plague the neighborhood where the BCI is located.  When he first took over the motel he tried to run it the way he had seen other motels operate in different states.  He immediately stopped charging "visitor fees" (a fee structure Mr. Patel had used during his management), he made several improvements to the property and he tried to generate business through short-term stays (one to two nights).  Unfortunately, the location of the BCI did not lend itself to that

business model as short-term stays were usually by out-of-town guests, who would frequently cancel their reservations when they saw the surrounding neighborhood. The BCI also struggled due to the fact that the longer-term tenants frequently had large numbers of visitors in their rooms. The visitors were often loud, damaged the property, drove up the utilities and disturbed the other guests. Mr. Bhula recalls one time when he found more than a dozen people staying in a room that was rented for only one guest. Mr. Bhula tried to stop this problem by prohibiting visitors and evicting some of the repeat offenders. The motel continued to have problems with unauthorized guests on the property, so Mr. Bhula reinstated the "visitors fees" for all tenants of the BCI. The purpose of the fee was to dissuade visitors, not to profit off of them.

Mr. Bhula also installed additional video cameras, increased security, cleaned the property up and worked with representatives from the Safe City Strike Force to improve the property. *See* Letter Dated 12/19/2018 attached as Exhibit B. He evicted guests when they were disruptive, failed to pay their rent, or when he caught them engaging in illegal activity. *See* List of Prohibited Persons attached as Exhibit C. For example, when he learned that Michael Avila, a.k.a. "Trigger" was selling drugs from his room at the BCI, Mr. Bhula evicted him from the property. The BCI continued to struggle with unregistered visitors coming onto the property and causing problems despite the visitor's fees, so effective May 17, 2019, all visitors were prohibited from entering the property between the hours of 10:00 p.m. and 9:00 a.m. Any guests violating this rule were subject to eviction from the property. *See* Notice Dated May 17, 2019, attached as Exhibit D.

Mr. Bhula acknowledges that he was in "over his head" when he assumed management of the BCI. Having limited experience in the hospitality industry and being unfamiliar with the Albuquerque drug culture, he was naïve and unaware of much that was happening at the motel.

That was compounded following the birth of his son in the summer of 2018 when his focus was on his new baby and wife. His work schedule had him at the motel during the days and he trusted his employees to manage the motel at night. When he became aware that there was drug use occurring on the premises, he tried various measures to curtail the activity, but his efforts were not particularly effective. When he became aware that some of his tenants may be engaging in prostitution, he discouraged that activity at the BCI by imposing the visitors' fees, installing video cameras, posting "No Trespassing" signs and eventually prohibiting visitors entirely. When he learned that drug trafficking was occurring at the BCI, he evicted the drug traffickers known to him. However, he did not conduct exhaustive room to room searches looking for evidence of criminal behavior as he respected the privacy of his guests. Nor did he evict every person that he suspected of criminal activity. This decision was based on economic considerations (he needed to pay his lease and support his family) but also because he felt sorry for many of his tenants. Mr. Bhula is a compassionate man and he did not want to see his guests homeless if he could avoid it. That is also why he allowed guests to keep their belongings in their rooms even after check-out time. Instead of evicting guests immediately, he gave them time to pay for the next night and held their rooms for them. The guests were always free to pack up their belongings and leave at any time, but many appreciated the opportunity afforded to them and they kept their property at the motel. This sometimes led to people not returning to the motel and abandoning their property, which Mr. Bhula had no choice but to clean up after a few days. Even then he frequently kept the property on-site and returned it to guests if they asked for it.

### III.    SENTENCING RECOMMENDATIONS

The sentence imposed by a District Court must be both reasoned and reasonable. *United*

*States v. Contreras-Martinez,* 409 F.3d 1236, 1241 (10th Cir. 2005).  Generally, when a criminal sentence is imposed within the range provided by the United States Sentencing Guidelines, on appeal the sentence is presumed to be reasonable and is reviewed for unreasonableness under the factors set forth in 18 U.S.C. § 3553(a).  *United States v. Kristl, supra,* 437 F.3d at 1054-55, see also *Rita v. United States,* 551 U.S. 338, 127 S.Ct. 2456, 2465 (2007).[1]  However, even when a sentence is imposed properly under the United States Sentencing Guidelines, it may still be considered to be unreasonable in light of the sentencing factors set out in section 3553(a). *United States v. Kristl, supra,* 437 F.3d at 1055.  Therefore, after the District Court correctly determines the advisory Guideline sentence, the Court must still determine that the advisory sentence is substantively reasonable.  *United States v. Chavez-Diaz,* 444 F.3d 1223, 1229 (10th Cir. 2006), citing *United States v. Kristl, supra,* 437 F.3d at 1054-1055.

In addition, section 3553 authorizes a sentencing court to impose a non-guideline sentence any time the District Court concludes that the advisory guideline range is too severe to reflect the nature of the present offense in light of the history and characteristics of the individual defendant.  *United States v. Trujillo-Terrazas,* 405 F.3d 814, 819 (10th Cir. 2005).  This is so because, in some cases (like this one), "the advisory Guidelines will clash with section 3553(a)'s primary directive: 'to impose a sentence sufficient, but not greater than necessary to comply with the purposes' of sentencing."  *United States v. Ranum,* 353 F.Supp.2d 984 (E.D. Wis. 2005).

Even when the guidelines were mandatory, they did not "displace the traditional role of the district court in bringing compassion and common sense to the sentencing process....In areas where the Sentencing Commission has not spoken . . . district courts should not hesitate to use

---

[1]  Nevertheless, this "presumption of correctness" does not apply in the District Court. Therefore, a District Court procedurally errs when it applies a presumption of correctness to the sentence recommended by the United States Sentencing Guidelines.  *United States v. Conlan,* 500 F.3d 1167, 1169 (10th Cir. 2007).

their discretion in devising sentences that provide individualized justice." *United States v. Williams*, 65 F.3d 301, 309-310 (2d Cir. 1995). "The Guidelines are not a straightjacket for district judges." *United States v. Cook*, 938 F.2d 149, 152 (9th Cir. 1991). The Guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom."

## IV.     THE NATURE AND CIRCUMSTANCES OF THE CRIMINAL CONDUCT

As described above, Mr. Bhula ran the BCI from March 2018 until his arrest in June of 2019. During that time he tried to clean up the motel, discouraged criminal activity and worked with the Safe City Strike Force. He imposed the visitor's fees in an effort to curtail traffic at the motel and when that didn't work, he eventually banned visitors at night. However, Mr. Bhula acknowledges that he could have done more to discourage criminal activity at the BCI, which is why he agreed to plead guilty to Maintaining a Drug-Involved Property.

To be clear, Mr. Bhula was not a drug trafficker, nor a sex trafficker. He had limited knowledge of the criminal activities that were occurring at his motel and never participated in any of them directly. He never possessed drugs, he never sold drugs, he never acted as a pimp, and he never directly profited from any drug or sex trafficking. His only income at the motel was through room rentals and the visitor's fees (during the time they were imposed). Room rentals and visitor's fees were imposed at the same rates for all guests and were not targeted at drug dealers or prostitutes. Further, Mr. Bhula never possessed any firearms and did not permit his employees to carry firearms while they were working.

The PSR suggests that Mr. Bhula be held accountable for quantities of drugs that he had no knowledge of, which were not reasonably foreseeable to him, and some of which were not even located at the motel. [Doc. 590, ¶ 39] Mr. Bhula has already objected to this in his Objections to the Presentence Investigation Report [Doc. 599] and will not repeat those

arguments here.  However, it bears emphasizing that Mr. Bhula adamantly denies ever being engaged in a conspiracy to commit drug trafficking.  His only crime was managing a motel where drug trafficking occurred, most of which Mr. Bhula was not aware of.  The participants of drug trafficking at the BCI intentionally hid their criminal activity from Mr. Bhula because they knew he would not condone it.  That was not a particularly difficult undertaking since Mr. Bhula was usually not present at the motel in the evening, was not knowledgeable about how drug trafficking works and he trusted his employees to manage things when he was not present. Finally, when Mr. Bhula did become aware that people were selling drugs at the BCI (e.g. Michael Avila), those people were evicted.

## V.    OTHER CONSIDERATIONS

### A. Seriousness of the Offense, Respect for the Law, Just Punishment

Although the crime which Mr. Bhula pleaded guilty to is serious, his involvement cannot be considered in a vacuum.  Mr. Bhula arrived at that point through a combination of naivete and economic necessity.  It was never his intention to run a motel wherein drug traffickers were conducting business.  Nor was it his intention to cause distress to the sex workers that apparently rented rooms at the motel.  Nor did he ever enter into a conspiracy to engage in drug or human trafficking.  His only objective was to manage a motel, provide housing to people in exchange for a rental fee and to support his family.  His dream was to do that in America, but that dream turned into a nightmare for him, destroyed his family and has taken away the single most important thing in his life, his son.   His entire life has been changed forever because of the indictment and his subsequent incarceration.  Not only has he lost everything he holds dear, the conditions of his incarceration have been so horrific as to be a violation of the Eight Amendment prohibition against cruel and unusual punishment.  He was forced to languish for months while

14

an aggressive tumor grew out of his mouth, distorted his face and erupted from his check.  He is permanently disfigured due to the significant delays in his medical treatment, he was almost starved to death, and the pain and suffering he endured was immense.  Mr. Bhula cannot even eat solid food as a result and will likely never speak normally again.

In addition to the obvious physical disfigurement, pain and suffering and lifelong speech impairment, the delayed medical treatment and subsequent growth of the oral tumors had another impact on Mr. Bhula's life.  Mr. Bhula's face became so disfigured that his own son became scared of him.  Telephone calls with his son became impossible due to the speech impairment, leaving video visits as the only option for Mr. Bhula to maintain some sort of relationship with his child.  However, as the disease spread across his face, his young son became so scared of Mr. Bhula that he refused to participate in the video visits.  He would cry and call Mr. Bhula a monster.  This hurt Mr. Bhula deeply and to this day his relationship with his son remains strained.  However, Mr. Bhula is optimistic that once he is released from custody and returns to South Africa he will be able to obtain reconstructive surgery and additional speech therapy and rebuild his relationship with his son.

The guidelines do not generally permit departure for these factors. However, "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." USSG 5H1.3.  This should apply equally to physical conditions and deterioration while in custody, as Mr. Bhula's case is atypical. Further, "[i]n certain cases a downward departure may be appropriate to accomplish a specific treatment purpose."  *Id*., (citing § 5C1.1, Application Note 7). This is exactly what Mr. Bhula asks for here, as he cannot receive proper treatment for

his condition while in custody.

The sentencing statute also provides that any sentence imposed "provide the defendant with needed…medical care…in the most effective manner…."  18 U.S.C. § 3553(a)(2)(D). One recent writer has bemoaned how many courts do not closely heed the statutory command or "fail to appreciate the BOP's severe limitations in providing rehabilitation and treatment 'in the most effective manner.'" Erica Zunkel, *18 U.S.C. § 3553(a)'s Undervalued Sentencing Command: Providing a Federal Criminal Defendant with Rehabilitation, Training, and Treatment in "the Most Effective Manner"*, 9 Notre Dame J. Int'l & Comp. L. 49, 50 (2019).  This Court need not find that Mr. Bhula cannot receive effective treatment in federal prison; it need only find he can receive more "effective" treatment outside of federal prison. *United States v. Edwards*, 595 F.3d 1004, 1011 (9th Cir. 2010) (Bureau of Prisons "capable of providing" medical care [but] "probation would satisfy the requirement of providing needed care in the most effective manner.")(citing 18 U.S.C. § 3553(a)(2)(D)).  As has already been made clear, Mr. Bhula has not been properly or effectively cared for while incarcerated, therefore a sentence of time-served is appropriate and the balance of punishment and treatment is accomplished.

## VI.    CONCLUSION

Based upon the aforementioned factors and circumstances, Mr. Bhula asks that the Court impose a sentence of credit time served as the just and reasonable sentence for him in this matter. This sentence is sufficient, but not greater than necessary, to achieve the goals of a fair and just sentence.


Respectfully submitted,

LAW OFFICES OF Nicole W. Moss, LLC

*/s/ Nicole W. Moss*
Nicole W. Moss
514 Marble Ave. NW
Albuquerque, NM 87102
(505) 244-0950


LAW OFFICES OF SARAH M. GORMAN

*/s/ Sarah M. Gorman*
Sarah M. Gorman
1201 Lomas Blvd. NW, Suite A
Albuquerque, NM 87102
(505) 243-5442


CERTIFICATE OF SERVICE

I hereby certify that on the 12th of March, 2024, I filed the foregoing pleading via CM-ECF, causing all registered parties to be served.

*/s/ Nicole W Moss*
Nicole W. Moss

17