IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 19-1631 DHU |
| | ) | |
| | ) | |
| **KAMAL BHULA,** | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S
SENTENCING MEMORANDUM (Doc. 661)**

The United States hereby responds as follows to Defendant Bhula's *Sentencing
Memorandum* (Doc. 661) filed January 16, 2024. The United States respectfully requests a low-
end guidelines sentence, to be followed by three years of supervised release.

**A. Procedural History**

On July 13, 2023, the Defendant pleaded guilty to Count 8 of the Second Superseding
Indictment, charging maintaining a drug-involved premises, in violation of 21 U.S.C. § 856 and
18 U.S.C. § 2. In his plea agreement, Defendant Bhula provided a robust and detailed factual
basis to support his guilty plea. It starts with him declaring under penalty of perjury that,
beginning in approximately March 2018, he acted as the on-site manager for the Best Choice Inn
until law enforcement shuttered the premises on June 18, 2019. He admitted under oath that, in
his capacity as a manager, he knew the tenants he rented to and persons he employed were using
controlled substances in the individual rooms of the hotel and on the overall premises. He
continues by admitting that he knew that that the tenants he rented to and the persons he
employed were selling controlled substances in the individual rooms of the hotel and on the
overall premises. Furthermore, in his signed and sworn plea agreement, Defendant Bhula stated
he knew that "rampant drug use was occurring at the Best Choice In by the tenants and

employees." Further, Defendant Bhula stated, "I knew that using and distributing controlled substances was one of the primary purposes of the Best Choice Inn. I nevertheless allowed it to continue." Lastly, the Defendant acknowledged in his plea agreement that he admits there is a factual basis for the crime, and "agrees that the Court may rely on any of these facts, as well as facts in the presentence report, to determine the Defendant's sentence, including, but not limited to, the advisory guideline offense level." Doc. 579, at 3-4.

## B. ACCEPTANCE OF THE GLOBAL PLEA AGREEMENTS PROVIDES FINALITY AND CLOSURE

In considering whether to accept the plea agreement, the United States requests that this Court consider the parties' interest in minimizing the uncertainties of trial by negotiating this settlement. "The potential to conserve valuable prosecutorial resources and for defendants to admit their crimes and receive more favorable terms at sentencing means that a plea agreement can benefit both parties." *Missouri v. Frye*, 132 U.S. 1399, 1407 (2012). Parties in a criminal case must assess the likely outcome of motions and trial practice. Defendants in particular must weigh their tolerance for the risk of losing a trial against the benefits of a negotiated settlement. Likewise, the United States must weigh the public and the victim's interest against the risks of proceeding to trial.

To that end, the United States carefully weighed the evidence in this case and evaluated the impact that further litigation would have on the victims. Despite the cooperation and strength of the victims, the prospect of detailing their story and enduring what undoubtedly would have been a grueling cross-examination created the very-real potential for further trauma. Indeed, as is common in sex trafficking cases, the victims in this cases were chosen, in large part, because they are vulnerable. They lack housing stability, they battle addiction, and they have developed a mistrust of law enforcement due to their past experiences and criminal histories. These

circumstances make them prime targets for exploitation, and history has taught that those who exploited them, once caught, would engage in unrelenting character assignation in an attempt to convince the jury that they lack credibility. To be sure, that very phenomenon permeated much of the pre-trial litigation in this case.

In negotiating the defendants' global plea agreements, the United States carefully considered the benefit of obviating the need for these women's testimony against the nature of the offense and defendants' histories. Accordingly, the United States asks this Court to accept Defendant Bhula's plea agreement.

## C.  REQUEST FOR SENTENCE

The United States agrees with the offense level and criminal history calculated in the Defendant's PSR and has supported these calculations in its response the Defendant's previously filed objections. (Doc. 609). The applicable guidelines range is 168 to 210 months, roughly 14 to 17.5 years.[1]  For the reasons outlined below, the United States asks this Court to sentence the Defendant consistently with his plea agreement to the low-end, that is,168 months imprisonment. Further, the United States requests three years of supervised release and a $100 special penalty assessment.

1. Nature and Circumstances of the Offense

In determining the proper sentence, this Court must consider the nature and circumstances of the offense and the history and characteristics of the Defendant. 18 U.S.C. §3553(a)(1). In this case, the Defendant maintained an entire hotel as a drug premises. With his boots on the ground, the Defendant was the on-site manager who determined who would be

---

[1] While there are defense objections to the guidelines pending, the Court has not ruled on any of Mr. Bhula's specific objections. Therefore, for purposes of this *Sentencing Memorandum*, the United States accepts as true and accurate the current calculation in the PSR.

rented rooms, who would be hired, what conduct would be tolerated, and what action would be taken if illegal conduct occurred on the premises. The establishment he managed, the Best Choice Inn, operated in a distressed neighborhood that was struggling with narcotics and poverty. As the Court is well aware, the Best Choice Inn gained profits by imposing a "visitor fee" on individuals who frequented the establishment. As a manager, the Defendant well knew that many of the people to whom a visitor fee was imposed specifically frequented the business to engage in illegal activity. Sometimes the fees were imposed on commercial sex workers, and, relevant to this sentencing, they were lodged against visitors to rooms where drugs were used or sold. Therefore, if a person visited a room for more than ten minutes and used or sold drugs, the Defendant would collect an additional ten dollars.

It is against that backdrop that the Defendant committed his crimes. Throughout his tenure at the Inn, the Defendant facilitated a virtual open-air drug market. Narcotics were regularly bought, sold, and used under his watch. This is not a case of simple nonfeasance where a motel manager sat idly by while crimes were being committed under his nose. Rather, this is a case where the Defendant sought to exploit for profit the crimes happening in his presence. He did so by participating in a *de facto* kickback scheme that required drug traffickers and users to pay a fee if they wanted to use the motel as a sanctuary for illegal activity.

The breadth of illegal activity occurring at the Best Choice Inn was breathtaking. From the time Defendant Patel took control of the establishment in 2017 until it was shut down on June 18, 2019, the Best Choice Inn was the one-stop shop in Southeast Albuquerque for criminal activity of all sorts. It was well known to law enforcement and criminals alike. Indeed, from January 1, 2018 through December 2018, there were approximately 195 calls for service to the Best Choice Inn. It is difficult to imagine a commercial establishment in Albuquerque that was the subject of *more* law enforcement attention than the Best Choice Inn. Throughout it all, the

Defendant permitted it to continue.

There is no doubt that the Defendant was fully aware of what was happening. To drive that point home, law enforcement orchestrated a simulated drug transaction on March 5, 2019, to gauge how the Defendant would react. This transaction – the so-called "sham" deal that the defendants have complained about throughout the pendency of this case – occurred in the office of the Best Choice Inn in full view of the Defendant. The transaction consisted of an undercover officer (UC1) – who the Defendant believed to be a drug trafficker – handing another undercover officer (UC2) a plastic bag with a paper bag inside. UC2 removed the contents in front of Bhula to reveal what appeared to be cocaine. As the Defendant watched, UC2 placed the "sham" cocaine back in the bag and confirmed with Bhula that there were no issues with him being present at the Inn to do business. To complete the transaction, UC2 then handed UC1 $2500 in plain view of Bhula. For all the Defendant knew, a rather substantial drug deal just occurred in front of him. After UC1 left, UC2 told Bhula that he might have visitors so he could "get rid of this stuff," gesturing to the cocaine. Bhula acknowledged without protest, thereby granting implicit consent to UC2 to deal drugs on the premises.

Three days later, on March 8, 2019, UC2 asked Bhula if a "girl" could use his room when he was not present. Bhula consented on the condition that he knew who she was and had her name on UC2's room ledger. UC2 stated the "girl" would likely have several visitors and would be "taking care of business" – not so subtle code for dealing drugs. Bhula stated that UC2 could pay her visitor fees. UC2 asked if Defendant Craft kept track of the visitors, and Bhula responded in the affirmative. All of this goes to the heart of the case: the Defendant facilitated the transaction of drugs on the condition that the Best Choice Inn gets its piece of the pie.

The relevance of this transaction is patently obvious. From the perspective of Bhula, he witnessed a real-life drug deal on March 5 in which one dealer was being supplied by another.

And, from the perspective of Bhula, he knew that UC2 would be selling the cocaine he bought through a proxy – the "girl" – on the property of the Best Choice Inn. In response to all of that, Bhula did nothing. He could have called the police. He did not. He could have removed UC1 and UC2 from the property. He did not. He could have told UC2 that no further drug transactions would be permitted. He did not. Rather, Bhula permitted the drug trafficking to continue and ensured that the Best Choice Inn would be getting its kickback.

So brazen was the conduct at the Best Choice Inn that even the legitimate customers knew what was going on. For example, this is just a sampling of the reviews left by those customers on travel web sites:

> *m.g.*
> *1/5*
> *3 weeks ago on Google-*
> *This is just a place for drugs, dealers and addicts to congregate with the owners permission*
>
> > *1/5*
> > *a week ago on Google-*
> *There was blood on the end table. Nasal spray on my chair, and cigarettes burns on the bed. There were holes on the walls and everywhere on the door. The front door doesn't lock, and is in a very bad part of town. Not a safe place for my kids whatsoever. None of the lights work. Smells so bad. Pee stains on the bed. Drugs everywhere. Front desk clerk was nice when we could find her though. DO NOT STAY HERE WHATSOEVER!!!!! Doesn't even deserve a star.*
>
> *Mr. Grumpy*
> *1/5*
> *2 months ago on Google-*
> *I visit a friend who happens to stay there on three different occasions. every time i visited there where shots that rang out 1. from the top floor walkway 2. from a guy chasing another through the parking lot*

6

*shooting carelessly at him 3. from a room to a vehicle hitting a man in the leg, where his friends picked him up and carried him to a car and sped off. The worse part was the police did not come in any of these shootings. The place is full of drug dealers and users and hookers, good luck not getting poked by a use needle left in the rooms!*

*J.T.*
*1/5*
*a year ago on Google-*
*DO NOT go here, unless of course you're looking for a prostitute and/or a drug dealer.   I have NEVER been more terrified in my life than when I went here to check in with my 3 children!!   I did NOT stay!   NOT FAMILY FRIENDLY!*

*G.G.*
*1/5*
*a year ago on Google-*
*Disgusting, roaches the manager is a hustler and will charge you ten dollars just to visit someone on the property. Random drug addicts everywhere not that I hate them. But it's a very dangerous place for those who are not from there or don't know what their in for.*

*R.L.*
*1/5*
*9 months ago on Google-*
*It wasn't very nice.prostitution rapid. Drugs in the pstwsys. Police are ever where. I'll never stat there again.*

At trial, the Government would have called the two members of the Inn's cleaning staff Inn who would have testified as to their observations of the drug activity at the establishment. They would have testified that it was routine to observe controlled substances and paraphernalia in the rooms. In fact, one of them would have told of a disturbing incident when she was stuck with a needle while changing the bedding in one of the rooms.

A swath of law enforcement witnesses would have also testified a trial. The would have described to the jury the numerous drug buys made out of the Inn. Further, they would have testified to the shocking volume of drugs and paraphernalia found at the Inn when they conducted their June 18, 2019 raid. The following photographs are a small sampling of what they found:












While all of this was going on, the Defendant had a choice: he could put a stop to it or continue to profit from the illegal activities occurring all around him. He made the wrong choice each step of the way. To be sure, the Defendant had innumerable opportunities to be the hero in this story. He could have put an end to it at any point. He did not. Even if the Defendant did not have the courage to contact law enforcement about what was happening all around him, he still had the opportunity to remove himself from the conspiracy by seeking employment elsewhere. Again, he did not. Instead of doing any of that, the Defendant chose instead to perpetuate the suffering and lawlessness in Southeast Albuquerque all the while profiting ten dollars at a time.

The nature and circumstances of the offense overwhelmingly favor the sentence the Government seeks in this case.

A.  History and Characteristics of the Defendant

The Government does not dispute much of what the Defendant writes in his Sentencing Memorandum concerning his life story up to his employment at the Best Choice Inn. From all indications, it appears as though the Defendant led a law abiding life up until contact with the establishment. While the Court can and should take all of that into account in crafting the appropriate sentence, it only gets the Defendant so far. Perhaps what is most striking is that the Defendant had the background, experience, and tools to make the right choices. Unlike many defendants who appear before this Court having been indoctrinated into a criminal lifestyle at an early age, the Defendant was far better situated to calculate right versus wrong. Taking him at his word, his background afforded him with the capacity to recognize and avoid life choices that earn so many others sentencing dates before federal judges. To be sure, he undoubtedly recognized that he was abetting the drug trafficking that permeates and ravages Albuquerque. Having two eyes, he unquestionably knew that what he was doing was contributing to the despair he saw all around him. But, despite apparently having a well-defined moral compass, he not only

11

let it happen, but opted to participate in a scheme to profit from it. Thus, the Defendant's unblemished life leading up to his crimes is as much an aggravating factor as it is a mitigating one because it demonstrates the callousness and disregard the Defendant displayed toward the decay around him. Despite having the ability to care about the impact of his crimes, he simply chose not to. He instead allowed the insanity occurring at the Best Choice Inn to continue day after day, week after week, month after month, and year after year.

The Defendant appropriately devotes a large portion of his *Sentencing Memorandum* discussing his cancer diagnosis. Certainly, this is a characteristic of the Defendant that 18 U.S.C. § 3553 permits the Court to take into account for sentencing purposes. The United States is sympathetic to the Defendant's condition and is genuinely consoled that he has been declared cancer free.

Where the Government and Defendant part ways, however, is the extent to which the Court should take into account his condition at sentencing. The Defendant argues that he should be sentenced to time served, that is, a bit over 57 months. Recognizing that the low-end of the advisory-guideline range is 168 months, it is not hyperbole to suggest that the Defendant's request is radical: he is asking for a 67% discount from the correctly-calculated guideline range. To put that in perspective, co-Defendant Craft received a discount of roughly 35% from his correctly-calculated guideline range – his low-end range was 108 months and he received a sentence of 70 months – and co-Defendant Patel received no discount whatsoever. Thus, to grant the variance the Defendant seeks would result in a manifest injustice by treating similarly-situated defendants differently.

None of this is to suggest that the Defendant's medical needs are irrelevant to sentencing. This Court can and should recommend that the Defendant be designated to an appropriate Bureau of Prisons medical center to ensure that his healthcare needs are monitored and served.

B.  Factors Detailed in 18 U.S.C. § 3553(a)(2)

In addition to considering the nature and circumstances of the offense and the history and characteristics of the defendant, the Court shall also consider:

(2) the need for the sentence imposed –
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant, and'
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The low-end of the guidelines sentence in this matter would reflect the seriousness of the conduct and provide just punishment for the offense under the circumstances. The proposed sentence reflects the culpability of the Defendant while taking into account his criminal history.

The harm caused by the Defendant's actions contributed greatly to the general struggles of this neighborhood. His conduct in this case suggests that the Defendant will continue to commit crime and be a danger to the community, especially vulnerable women.

D.   Avoiding Unwarranted Sentence Disparity

While the concern over preventing unwarranted sentence disparities is well-founded, courts have repeatedly noted that mitigating this risk is only one factor that should be considered when imposing a sentence. *United States v. Martinez*, 610 F.3d 1216, 1228 (10th Cir. 2010). More specifically, disparate sentences are permitted "where the disparity is explicable by the facts on the record.   *United States v. Davis*, 437 F.3d 989,997 (10th Cir. 2006). So long as the imposed sentence falls within the "range of possible" outcomes supported by the circumstances of the offense, the reviewing court must defer to the district court's judgement.   *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007).   A minor variance need be supported by less justification than a major variance.   *Gall v. United States*, 552 U.S. 38, 50 (2007).

As discussed above, the Defendant requests a time-served sentence, which is a significant

13

variance from the guidelines and far different than the types of sentences that this Court has imposed on co-defendants.    The United States urges this Court to reject that radical request and impose a more appropriate sentence reflected in the low-end of the correctly-calculated advisory guideline range.

## CONCLUSION

The United States hereby requests that the Court accept the global plea agreement, adopt the findings in the PSR, and sentence the Defendant to the low end of the applicable guidelines range.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

***Electronically filed 3/18/2024***
LETITIA CARROLL SIMMS
JACK E. BURKHEAD
Assistant U.S. Attorney
P.O. Box 607
Albuquerque, New Mexico 87103
(505) 346-7274

I HEREBY CERTIFY that on the 18th day
of March 2024, I filed the foregoing
pleading electronically through the
CM/ECF system, which caused counsel
of record for defendant to be served
by electronic means.

***Filed Electronically***
LETITIA CARROLL SIMMS
Assistant U.S. Attorney

14